PRODUCTION CREDIT ASSOCIATION
OF MINOT, North Dakota, Plain-
tiff/Appellee,

v.

Herbert T. GEVING, a/k/a Herbert Geving,
as Herbert Geving, Jr., and as Herb
Geving, Defendant/Appellant,

and

Cecil Zahnow et al., Defendants.

Civ. No. 8927.

Supreme Court of North Dakota.

March 27, 1974.

Rehearing Denied June 4, 1974.

McGee, Hankla, Backes & Wheeler, Minot, for defendant /appellant.

Pringle & Herigstad, Minot, for plaintiff /appellee.

TEIGEN, Judge.

The defendant, Herbert T. Geving (hereinafter Geving), takes this appeal from a judgment foreclosing a security agreement and real estate mortgage given to Production Credit Association of Minot (hereinafter PCA), adjudicating the rights of the defendants, Cecil Zahnow, Dennis Zahnow, Wayne Zahnow and Helen Zahnow (hereinafter Zahnows), and dismissing Geving's counterclaim against PCA, and, also, from an order denying Geving a jury trial.

Pursuant to the judgment, the Zahnows, who are creditors of Geving and holders of a first lien, will be paid in full. They are not parties to this appeal.

PCA commenced this action against Geving for the sum of $272,763.09, plus interest, evidenced by nine, past-due promissory notes, and for the foreclosure of a real estate mortgage and a security agreement securing the indebtedness. The promissory notes were given in consideration of money loaned by PCA to Geving for the purpose of purchasing land and cattle from the Zahnows, for operating expenses of Geving's farming and ranching interests, for the payment of certain pre-existing debts, and to make certain limited capital expenditures pursuant to a Loan Agreement.

In his answer and counterclaim Geving admitted the execution and delivery of the notes, the security agreement and the real estate mortgage, but alleged that PCA was

estopped from foreclosing because of representations made by PCA, which were later controverted, which were relied upon by Geving with respect to the purchase of land and cattle from the Zahnows. He further alleged that PCA failed to exercise reasonable care, skill and diligence in assisting him in the preparation of the Loan Application, schedules, statements and projections necessary in setting up his operation; that as a result of PCA's negligence, breach, and unreasonable and unlawful acts, Geving was unable to meet the unrealistic conditions of the Loan Agreement and was placed in a detrimental position from which he could not avoid substantial loss. Geving asked that the complaint be dismissed and that he be awarded judgment against PCA for $600,000 in damages. In his answer and counterclaim, Geving also demanded a trial by jury.

PCA, by reply, denied the allegations of the counterclaim and recited the execution of a Loan Settlement Agreement and Assignment for Benefit of Creditors as an affirmative defense.

PCA moved to strike Geving's demand for jury trial and, after hearing, the trial court granted the motion and issued its order striking the demand.

Prior to 1969 Geving was a farmer, residing on his home farm consisting of 1,030 acres of land, which land was devoted principally to grain farming. According to Geving's testimony he owed between $45,000 and $50,000, which was secured by a mortgage and a contract for deed on the land.

Geving testified that he had seen some of PCA's advertising announcing the availability of farm loans and, in October 1969, he met Neal Henderson, a representative of PCA. At that time, he maintains that Henderson informed him that PCA had made several loans approaching a half million dollars. Geving testified: "After I had talked to Neal, the next few days I just got to thinking I wanted to expand." He had known the Zahnows, who owned 2,520 acres of land and ran a herd of about 430 cows and 12 Charolais bulls, and "had the feeling that maybe they would sell * * *." Geving then approached PCA concerning the possibility of financing the purchase of the land and cattle from the Zahnows, should they be willing to sell. Geving and Henderson met on several occasions and worked on financial statements and other matters with respect to Geving's financial status at that time. Geving eventually was authorized to negotiate with the Zahnows for the purchase of their property. Geving and the Zahnows agreed on a purchase price of $345,000 for the Zahnow real estate and cattle.

Together with PCA, Geving prepared other financial forms, including a cash-flow projection containing projected income and expenses from the proposed operation, which would include the Geving farm plus the Zahnow purchase, as well as a garbage collection business which Geving operated in Parshall.

Because of his unfamiliarity with such matters, Geving testified that he relied heavily on Henderson's experience. He also conferred with Duane Gjervold, manager of PCA, concerning a loan to make the initial payment to the Zahnows and to provide operating capital for 1970. It appears that on the basis of the projections Geving would be able to repay PCA the amount of $92,250 by February 1, 1971. This repayment projection was later raised, by mutual agreement, to $99,000 by February 1, 1971.

On November 10, 1969, Geving signed a Loan Application to PCA for the sum of $214,108. This figure included $155,058 to cover the first two payments on the security agreement and contract for deed with the Zahnows, together with $18,000 to pay a loan Geving owed Lakeside State Bank of New Town, North Dakota, $30,000 for operating capital, and $11,050 for his membership equity in PCA and the loan fee. On the same day he signed a promissory note in favor of PCA in the amount of

$214,108, payable February 1, 1971. As security Geving executed a security agreement and a real estate mortgage in favor of PCA, which covered the Zahnow cattle, his own farm machinery and equipment, the home farm and the farm land which he was purchasing from the Zahnows. PCA filed these papers for record in Mountrail County, where the home farm and the Zahnow land are located. Four days later, to wit, on November 14, 1969, Geving and the Zahnows entered into a security agreement and contract for deed covering Geving's purchase of the Zahnow land and cattle. Payments on these contracts were to be made by assuming the encumbrances outstanding against the land, and the balance of $310,117.60 was made payable in four equal installments of $77,529.40, payable November 14, 1969, and on January 15 of 1970, 1971 and 1972.

The cattle were located on the Zahnow home farm in McLean County and the Zahnows filed their financing statement in McLean County. The Zahnows retained possession of the cattle in McLean County as they had agreed to feed the cattle through the 1969–70 winter and deliver them to Geving in Mountrail County in April 1970.

It is Geving's contention that, although the promissory note which he gave PCA did not cover all of his financial requirements, he believed he was entering into a long-term arrangement for financing with PCA whereby PCA guaranteed to make necessary loans to him to complete the contract payments to the Zahnows as they became due. This is denied by the representatives of PCA.

A controversy developed over whether PCA or the Zahnows should hold the first lien on the. land and cattle which the Zahnows were selling to Geving. PCA claims that Geving had said that PCA would have a first lien on the cattle. On January 7, 1970, before delivery of the cattle in Mountrail County, Henderson, of PCA, Geving, and the Zahnows and their attorney, met in Parshall to discuss the problems which had arisen. The Zahnows had not filed their financing statement covering the cattle in Mountrail County. However, PCA had filed its financing statement in that county in November 1969. For this reason the Zahnows refused to deliver the cattle to Geving in Mountrail County in the spring of 1970 until they had received assurances from PCA and Geving that there would not be prepayment on the contract for deed and security agreement, and until PCA withdrew its financing statement in Mountrail County and permitted the Zahnows to file their financing statement as a first lien. Finally, a Memorandum of Understanding was drawn up and signed by the parties at a meeting in Parshall on April 10, 1970. This memorandum provided that the Zahnows would have a first lien on the cattle and PCA and Geving agreed not to accelerate the payments on the contracts. The Zahnows agreed that Geving would be free to market the cattle and calves as long as the payments to them were current and Geving was entitled to remit such proceeds from the sales to PCA. The Zahnows also agreed to deliver to PCA the abstracts of title on the real estate being purchased by Geving so that PCA could obtain title opinions thereon.

It appears that while these negotiations were in process, Geving was unable to make the second installment payment due the Zahnows on January 15, 1970. He apparently had other financial obligations which he had failed to disclose in his loan application to PCA. For these reasons, PCA made Geving an additional loan of $25,000, evidenced by a note dated January 21, 1970, also due February 1, 1971.

The cattle were moved to the Geving farm in Mountrail County. However, in the summer of 1970 Geving was exceeding the expense projections which he had made for his operation and his income was far less than had been projected. Adverse weather conditions during the spring of 1970 had caused the loss of about twenty cows and about ten percent of the calf

crop. PCA and Geving had numerous conferences in an effort to keep Geving operating, and PCA advanced Geving an additional $24,441.27 from June 25 through October 14, 1970. These advances were each evidenced by a promissory note due February 1, 1971.

In December 1970 financial information submitted by Geving indicated that his income was less than projected and his expenses were greater than projected and, on December 29, 1970, a meeting was held in the PCA office at which time PCA informed Geving of its intention to terminate his loan.

It had been projected that Geving's loan balance at the end of 1970 would be $161,258; however, the actual loan balance was $221,689.33. PCA contends that these facts indicated to it that Geving had not shown the managerial ability to successfully handle his ranching operation, thus leading it to the conclusion that it could not continue to finance Geving unless there were material changes in his operation. Several meetings were held and PCA informed Geving that it intended to terminate the loan. However this was finally tempered with a proposal that PCA might carry the loan until spring, or perhaps fall, of 1971 if Geving would dispose of some of the land and cattle so as to reduce his debt, but Geving felt that liquidating part of the operation would not improve his position but would worsen it and so he refused.

There were also disputes pertaining to future payments and Geving, in conversation, indicated that he might utilize the courts to compel PCA to make the remaining payments to the Zahnows. PCA construed his statements as threats to commence a lawsuit.

There were also disputes over the meaning of terms used in the Memorandum of Understanding of April 10, 1970.

On February 16, 1971, PCA made an additional advance to Geving, evidenced by a note in the amount of $12,000, due on demand.

Subsequent thereto, after various proposals had been made by both parties and there had been extensive negotiations, a Loan Settlement Agreement and Assignment for Benefit of Creditors was entered into between the parties on March 17, 1971. On the same day Geving signed two additional promissory notes, payable to PCA, one in the amount of $40,235.20 and the other in the amount of $26,021.04, both due on demand.

Prior to the making of the Loan Settlement Agreement and Assignment for Benefit of Creditors, much discussion and negotiations were had over a period of time at a number of meetings. Geving, during these negotiations, was represented by an attorney who also participated in the discussions and negotiations and was present at the time of the execution of the Loan Settlement Agreement and Assignment for Benefit of Creditors which was finally consummated on March 17, 1971. This Agreement reads as follows:

"THIS AGREEMENT made this 17 day of March, 1971, by and between PRODUCTION CREDIT ASSOCIATION OF MINOT, NORTH DAKOTA (hereinafter PCA) and HERBERT T. GEVING, Parshall, North Dakota (hereinafter Geving), upon the following terms and conditions:

"1. Present Indebtedness. It is agreed that Geving was indebted to PCA, as of February 15, 1971, by virtue of six separate promissory notes, as follows:

| "Dated | Due | Amount | Interest Rate |
|--------|-----|--------|---------------|
| "Nov. 10, 1969 | Feb. 1, 1971 | $214,108.00 | 9.5 |
| "Jan. 21, 1970 | Feb. 1, 1971 | 25,000.00 | 9.5 |
| "June 25, 1970 | Feb. 1, 1971 | 3,665.00 | 9.9 |
| "July 30, 1970 | Feb. 1, 1971 | 185.00 | 9.9 |
| "Aug. 17, 1970 | Feb. 1, 1971 | 12,500.00 | 9.9 |
| "Oct. 14, 1970 | Feb. 1, 1971 | 8,091.27 | 9.9 |

"That the unpaid principal balance of the above-described promissory notes, as of February 15, 1971, was $210,539.19, with

accrued interest of $799.98 and with further accruing interest at the rate of 8.1 percent per annum, or $46.72 per day.

"That the above-described promissory notes are in default and are secured by a real estate mortgage covering the real estate described in Exhibit 'A' attached hereto, and further secured by a Security Agreement and Financing Statement covering the livestock and tangible personal property described in Exhibit "B" attached hereto.

"2. *Assignment for Benefit of Creditors.* Geving does hereby assign to PCA, by accompanying Warranty Deed and Bill of Sale, the property described in Exhibits 'A' and 'B' attached hereto, in trust for the following purposes:

"(a) *Possession of Property.* PCA does hereby entrust the possession of said property to Geving until November 15, 1971, for the benefit of Geving's creditors, in order to provide for the operation of said property during the 1971 farming season. Said Warranty Deed and Bill of Sale will be held by Pringle & Herigstad, P. C., to be used as set forth in this Agreement.

"(b) *Advances.* In order that said farm and ranch properties may be operated during the 1971 season to produce the maximum revenues for Geving and his creditors, PCA will loan to Geving up to a maximum of $45,751.27 for operating expenses, pursuant to the list attached hereto as Exhibit 'C'. All such advances will be made directly by PCA to the vendor of the services or merchandise, on invoices submitted and approved by Geving, and upon Geving's executing a promissory note therefor, bearing interest at the rate then in effect for PCA loans, and due and payable on November 1, 1971.

"PCA will have no legal obligation whatsoever to advance any other funds. However, PCA will loan funds for such capital and operating expense items as it, in its sole discretion, deems necessary to protect the value of the above-described collateral, for the benefit of Geving and his creditors.

"At the execution of this Agreement, PCA intends to loan Geving funds to pay installments due American State Bank of Minot, North Dakota on a swather contract and the Federal Land Bank Association of Minot, North Dakota, on a real estate mortgage; provided, however, that if said Federal Land Bank payment is made, Geving agrees to use the income tax refund of $3,000.00, for which he has made claim, to pay expenses listed in Exhibit 'C' hereof, thereby reducing the funds to be loaned by PCA under Paragraph (b) to $42,751.27.

"(c) *1971 Operating Results.* On November 1, 1971, or as soon thereafter as is practical, a determination will be made by PCA of the 1971 operating results for the above-described farm and ranch properties. If 1971 operating income does not exceed 1971 operating expenses (as those terms are hereinafter defined), plus 1/40th of all capital indebtedness of Geving determined as of November 1, 1971, PCA shall proceed as trustee aforesaid to liquidate said farm and ranch properties for the benefit of all creditors of Geving, pursuant to Chapter 32–26 of the North Dakota Century Code. Said liquidation and distribution of proceeds shall be under the jurisdiction of the District Court of Mountrail County, North Dakota, as provided in said Chapter 32–26, and as follows:

"(1) Livestock shall be sold on open market. Machinery and other tangible personal property shall be sold at auction sale, and land shall be sold at private sale, with Geving to have thirty (30) days' notice of any proposed sale negotiated prior to November 1, 1972. Such proposed sale may be completed unless a higher bidder is secured by Geving within the thirty-day period.

"(2) Proceeds of liquidation shall be used to pay the reasonable expenses of

sale; to pay creditors of Geving, pursuant to the preferences and priorities established by the laws of North Dakota; and to pay any balance to Geving.

"(3) For the more effectual execution of this Assignment and of the trust hereby created, Geving hereby irrevocably appoints PCA his attorney, with power of substitution and revocation, and with complete authority to do anything necessary for the full execution of this assignment and trust; to demand of and receive from any person all property, debts, and demands belonging and owing to Geving, and to give acquittances and discharges therefor; to sue for, prosecute, defend, and interplead on account of all such property, debts and demands; and to execute, acknowledge, and deliver all deeds, instruments of conveyance, receipts, and releases necessary or proper for the execution of this trust.

"(d) *Reassignment.* If said 1971 operating income does exceed said 1971 operating expenses, plus 1/40th of said capital indebtedness, this Assignment for the Benefit of Creditors shall terminate, and PCA shall immediately reconvey the farm and ranch properties described in Exhibits 'A' and 'B' to Geving, by returning to him the Warranty Deed and Bill of Sale above described.

"However, all indebtedness of PCA by Geving shall be due and payable on November 1, 1971, and PCA shall have no obligation whatsoever to renew or extend the time for payment of said notes, even if the within Assignment for Benefit of Creditors is terminated. PCA may, at its option, demand payment in full of all such indebtedness and may commence legal proceedings to enforce its security interest in said collateral and may otherwise avail itself of all creditor's rights granted to it under North Dakota law.

"(e) *Determination of Operating Income and Expense.* The determination of 1971 operating income and expense, for purposes of Paragraphs (c) and (d) above shall be made on an accrual basis for the period from January 1, 1971, to November 1, 1971. The terms 'operating income' and 'operating expense' shall mean those items of income and expense accrued during said period which are classified as operating income and expense by the Agrifax Accounting System, except that all income earned by Geving from his garbage disposal business during said period shall be included as operating income, and all living and personal expenses incurred by Geving during said period shall be included as operating expense.

"Further, for purposes of said determination there shall be charged as an operating expense a depreciation allowance of ten percent for cattle (with a beginning inventory of 411 cows at $300 each and 18 bulls at $500 each); a depreciation charge of $2,500 for machinery and other equipment; a charge for cattle lost by death or otherwise of $300 for cows and $500 for bulls; and all interest accrued on all of Geving's indebtedness for the period November 1, 1970, to November 1, 1971. Any calves then on hand shall be valued at the market price for similar animals available in Minot, North Dakota, on November 1, 1971 (or on the basis of a bona fide cattle buyer's bid, if there is a disagreement as to the Minot market price). Feed on hand shall be excluded.

"3. *General Conditions.*

"(a) PCA shall receive all of the proceeds from the sale of cattle and crops, and shall receive all government agricultural payments and all other income received from the properties described in Exhibits 'A' and 'B'. All such farm receipts shall be applied to the indebtedness due PCA.

"(b) Geving shall provide PCA, at its request, with all balance sheets, earning statements and other financial data of his operation, and PCA shall have access at all reasonable times to Geving's books that are in his possession or in the possession of his agents, attorneys or accountants.

"(c) Geving agrees to maintain adequate casualty insurance on all collateral and to care for all collateral in a manner consistent with good husbandry. Geving further agrees to assign to PCA the $100,000 decreasing term life insurance policy on his life.

"(d) Geving agrees that all open cows shall be sold by August 15, 1971.

"(e) Geving agrees that all cattle sales shall be approved in advance by PCA.

"(f) PCA shall have the right at all times to inspect the cattle and other collateral and determine that said collateral is being adequately cared for.

"(g) Geving agrees to make a good-faith effort to refinance all real estate owned by him on a long-term basis, in order to reduce his indebtedness to PCA.

"4. *Events of Default.* In the event Geving violates any of the general conditions hereinabove set forth, or in the event of any of the following events of default, PCA may, at its option, declare this Loan Settlement Agreement terminated and may immediately foreclose by judicial action its security interest in said collateral and otherwise avail itself of all creditor's rights granted it under North Dakota law:

"(a) Issuance of an injunction or attachment against the property of Geving.

"(b) Calling of a meeting of creditors or institution of insolvency or bankruptcy proceedings by or against Geving.

"(c) Such a change in the condition or affairs (financial or otherwise) of Geving as in the opinion of PCA impairs PCA's security or increases its risk hereunder.

"5. *Complete Settlement.* The within Loan Settlement Agreement and Assignment for Benefit of Creditors is a full and complete settlement of all transactions between PCA and Geving, as of the date hereof; and each party covenants with the other that all claims of whatever nature against the other, with respect to all transactions prior to this date, are hereby waived and merged in this agreement.

"IN WITNESS WHEREOF, The said parties have hereunto set their hands the day and year first above written."

Paragraph 2(b) of this agreement provides for the advances evidenced by the last two promissory notes referred to above. However, PCA makes no claim on the $26,021.04 note as the advance contemplated for the balance of the third installment due the Zahnows was rejected by them.

Geving operated under the Loan Settlement Agreement in 1971. In November of that year conferences were held to review the 1971 operation. The review indicated that Geving's income was short of meeting his 1971 operating expenses, plus 1/40th of all operating capital indebtedness, by some $2,800. It appears, however, that because Geving had come reasonably close to meeting the requirements of paragraph 2(c) of the Loan Settlement Agreement, and because Geving disputed PCA's computations, PCA decided not to use the Assignment for Benefit of Creditors portion of the agreement, and Geving was informed that PCA was not going to continue to finance him further but would foreclose unless Geving could come up with a plan to materially reduce his indebtedness. Geving again refused to consider selling any portion of his cattle or real estate to reduce the debt but submitted an alternative proposal which asked for additional financing from PCA. PCA rejected his proposal and, pursuant to paragraph 2(d) of the Loan Set-

tlement Agreement, returned the deed and bill of sale to Geving and instituted the present action in foreclosure in March 1972, as authorized under paragraphs 2(d) and 4 of the Loan Settlement Agreement.

Shortly after the foreclosure action was commenced, Geving, with permission of PCA, sold all the cattle covered by the security agreement and the money from such sale was deposited in the district court pending determination of the action. Following trial, the district court decreed a foreclosure of the security agreement and the real estate mortgage. It ordered a division of the money on deposit from the sale of the cattle between the Zahnows and PCA according to their relative interests therein.

It also appears from the briefs of the parties that, by agreement between PCA and Geving, Geving was given clear title to his farm machinery and equipment listed in the security agreement to PCA without the necessity of a sheriff's sale. Further, it appears that PCA and Geving entered into an arrangement whereby PCA purchased the Zahnow land from Geving at private sale rather than having it sold at sheriff's sale. The Geving home farm was sold at sheriff's sale and was bid in by PCA for the sum of $75,000.

According to the computation of the attorneys in their briefs it appears that after allowing credits for the various sales and transfers of properties, there remains due and owing to PCA from Geving the sum of $35,172.98 as of June 25, 1973, and that Geving is entitled, under the redemption laws, to redeem his home farm for that amount, plus interest. The home farm is presently in the possession of Geving under these redemption rights.

Because it appears from the record that the Geving home farm was encumbered to the Federal Land Bank and the State of North Dakota in an amount of $45,000 to $50,000 at the time of the original transaction between Geving and PCA in November 1969, which encumbrances were prior liens to PCA's mortgage, and because the Federal Land Bank and the State were not named as defendants in this foreclosure action and no reference is made to them in the judgment of foreclosure, we assume that these encumbrances were paid during the period between November 1969 and the institution of the foreclosure proceedings in this case. Thus it appears that Geving may be in a position to give security as a first lien on the home farm and his farm machinery and equipment for the purpose of obtaining a loan to cover the amount required to redeem from PCA.

Further, it appears that during the period from November 1969 to the institution of the foreclosure proceedings in 1973 Geving purchased a quarter section of land on contract and made the down payment thereon; he also made a down payment on the purchase of a house in Parshall for his mother and purchased furniture to furnish it; he paid $12,000 cash rent for another farm; drilled a well on his home farm; purchased several pieces of new farm equipment; and purchased additional equipment for his garbage-hauling business in Parshall. It appears that some of these acquisitions were made without prior consent of PCA and in violation of paragraph 2(e) of the Loan Agreement, which provides:

> "BORROWER will not make purchases of machinery, motor vehicles, equipment, land or real estate improvements in excess of the amount budgeted therefor in the loan application for the year in question, without prior written approval from PCA. BORROWER will not rent additional farmland without prior written consent of PCA."

These were also contributing factors to disagreements which arose.

The thrust of Geving's argument on this appeal is that the trial court erred in not allowing him a jury trial on his counterclaim or in the alternative, that the trial court erred in dismissing his counterclaim. No issue is made on the foreclosure.

PCA argues that the trial court correctly determined the issue on the applicable law and correctly held that Geving had waived his claim for damages, if any he had, when he entered into the Loan Settlement Agreement and Assignment for Benefit of Creditors, referring particularly to paragraph 5 thereof, which provides:

"5. *Complete Settlement.* The within Loan Settlement Agreement and Assignment for Benefit of Creditors is a full and complete settlement of all transactions between PCA and Geving, as of the date hereof; and each party covenants with the other that all claims of whatever nature against the other, with respect to all transactions prior to this date, are hereby waived and merged in this agreement."

■ We must first determine whether Geving had, in fact, waived his right to sue on his counterclaim because, if he had, then if error was committed by the trial court in striking the demand for a trial by jury, such error was without prejudice.

■ In Swan v. Great Northern Ry. Co., 40 N.D. 258, 168 N.W. 657 (1918), we held in paragraph 1 of the syllabus:

"A compromise and settlement fairly made operates as a merger of, and bars all right to recovery on, the claim or right of action included therein. The compromise agreement is substituted for the pre-existing claim or right, and the rights and liabilities of the parties are measured and limited by the terms of the agreement."

■ Geving does not claim that PCA violated the Loan Settlement Agreement. His claim is based on alleged facts which occurred prior thereto. Geving had the assistance of an attorney throughout these negotiations. He signed the Agreement containing paragraph 5 quoted above, and waived all pre-existing claims of whatever nature and with respect to all transactions prior to March 17, 1971, the date of the Agreement.

With respect to the Loan Settlement Agreement and its operation in this case, the findings of fact of the trial court provide, in pertinent part, as follows:

"IV.

"Following the execution of the promissory notes, Security Agreement and real estate mortgages referred to in paragraphs I, II and III above, numerous disputes and claims arose between the parties concerning this loan transaction. The Plaintiff and the Defendant Geving reached a settlement of all disputes and claims arising from the said loan transaction and executed a Loan Settlement Agreement and Assignment for Benefit of Creditors on March 17, 1971, which agreement was received in evidence in this 'case as Plaintiff's Exhibit 26. * * * That said Loan Settlement Agreement further provided in paragraph 5 thereof that said agreement constituted a full and complete settlement of all transactions between the Plaintiff and the Defendant Geving and that each party covenanted with the other that all claims of whatever nature were waived.

\*     \*     \*     \*     \*     \*

"XV.

"Defendant Geving failed to prove that the Plaintiff made the misrepresentations as alleged in his Answer or committed the wrongful and negligent acts as alleged in his Counterclaim and further, the Defendant Geving's claims based on misrepresentations and wrongful and negligent acts of the Plaintiff are barred under the terms of the Loan Settlement Agreement dated March 17, 1971."

The evidence conclusively shows that Geving signed the Loan Settlement Agreement and that he knew what he was signing when he did so. He had made some objection to paragraph 5, and this matter was discussed fully with his attorney and,

also, with PCA. He also accepted and used an additional advance of over $40,000, for which he signed a promissory note, and agreed to accept an additional advance of over $26,000 to complete the third installment payment on the cattle to the Zahnows. The signing of the Loan Settlement Agreement and the acceptance of the advances referred to above were done simultaneously.

█ A compromise stands upon the same footing as other contracts and either party may enforce it or recover damages for its breach. Swan v. Great Northern Ry. Co., *supra*.

Throughout the record we find nothing that charges deceit, misrepresentation or fraud. The evidence clearly establishes that the Loan Settlement Agreement, signed by both parties, is a contract, the full benefits of which Geving accepted and retained. He has not sought to rescind this contract under the provisions of Chapter 9–09, N.D.C.C., nor has he offered to return the money advanced, or any part of it. Instead, he attempts to challenge its validity on the claim that his apparent consent to enter into the Loan Settlement Agreement was not real or free because it was obtained through duress. He cites in support thereof Section 9–03–03, N.D.C.C., which in part provides:

"An apparent consent is not real or free when obtained through:

"1. Duress;"

Geving seeks to escape the operation of the compromise and settlement contained in the Loan Settlement Agreement by arguing that he was coerced into signing under duress because he had no choice as PCA would have foreclosed had he not signed. The defense of duress was not pleaded and was not raised until the final arguments were heard by the trial court. It was not raised affirmatively in the pleadings as required by Rule 8(c), N.D.R.Civ.P. The trial court, in ruling upon this issue when it was raised in the final arguments, stated:

"This is not the type of duress that the law contemplates here. He [Geving] may have been pinched economically, which many people feel compels them to take certain economic actions, but if the Plaintiff had the right to pursue its remedies, merely pursuing those remedies is not the type of coercion or inducement that the law precludes.

\*   \*   \*   \*   \*   \*

"If they [PCA] had a right to pursue a remedy, the threat to pursue it is not the type of conduct that gives rise to economic coercion. They would have had to threaten him in some other way with respect to which they had no right to threaten him before this can be held illegal."

█ It appears, therefore, that the trial court, as a matter of law, ruled out the question of duress during the course of the trial. The defendant seeks review of this decision on the basis that the court "clearly erred" in failing to find that Geving was under duress when he signed the Loan Settlement Agreement. Geving does not purport thereby to invoke the "clearly erroneous" test of Rule 52(a), N.D.R.Civ.P., nor may he do so since the ruling as to what constitutes duress is one of law and not a finding of fact. Clement v. Buckley Mercantile Co., 172 Mich. 243, 137 N.W. 657 (1912); Norton v. Michigan State Highway Department, 315 Mich. 313, 24 N.W.2d 132 (1946).

Geving urges this court to adopt and apply in this case the doctrine of "business compulsion" or "economic duress." Our research of this doctrine leads us to the conclusion that if it were to be accepted it would not be properly applicable in this case as PCA had every right to exert the pressure which it exerted as Geving was clearly in default. With respect to this doctrine, 25 Am.Jur.2d, Duress and Undue Influence, §§ 6, 7, pp. 361, 363, provide:

"There is no doubt that the early common-law doctrine of duress has gradually expanded and broken through its original

limitations, and it is now recognized that undue interference with the conduct of a business or occupation may constitute duress. Many states have adopted the modern doctrine of 'business compulsion' or what is sometimes referred to as 'economic duress or compulsion'. * * *

* * * * * *

"To constitute business compulsion there must be more than a mere threat which might possibly result in injury at some future time, such as a threat of injury to credit in the indefinite future. It must be such a threat that, in conjunction with other circumstances and business necessity, the party so coerced would fear a loss of business unless he entered into the contract as demanded. The pressure must be wrongful, and not all pressure is wrongful. 'Business compulsion' is not established merely by proof that consent was secured by the pressure of financial circumstances, or by the fact that one party insisted upon a legal right and the other party yielded to such insistence. * * *"

■■■ With respect to the foregoing requirements and factors the record here shows that, as of the time of the settlement agreement, Geving had signed six promissory notes, all of which were past due, and that under the terms of the mortgage and security agreement PCA had the right to institute foreclosure proceedings. Although the evidence indicates that PCA rarely fails to renegotiate and renew its loans, the fact remains that PCA was entitled, under the law, to not renew or extend its loans. It further appears that PCA had sufficient reasons for failing to renew or extend these loans, among them the following: that Geving had shown a lack of managerial ability; he had failed to disclose certain debts which he owed at the time of the original application for the loan; he had made a number of purchases without obtaining prior authorization from PCA; and he had failed and refused to follow recommendations made by PCA to better his financial standing and reduce his indebtedness. Under the circumstances, PCA had a right, under the law, to protect its investment as best it could. We find that the pressure on Geving and PCA's decision not to renew or extend further credit unless Geving signed the Loan Agreement were not, under the circumstances of this case, wrongful pressure contemplated within the doctrine of "economic coercion" or "business compulsion."

Under the circumstances of this case, we find that the settlement entered into on March 17, 1971 contains a compromise which was fairly made and operated as a merger of, and barred all right to recovery on, the claims set forth in Geving's counterclaim, and that the trial court did not err in dismissing the counterclaim. Therefore there was no prejudice in denying a jury trial.

The judgment and order appealed from are affirmed.

ERICKSTAD, C. J., and PAULSON, KNUDSON and VOGEL, JJ., concur.