JAMESTOWN FARMERS ELEVATOR, INC., formerly Mutschler Grain Company, a North Dakota Corporation, Plaintiff,

v.

GENERAL MILLS, INC., a Delaware Corporation, Defendant.

Civ. No. A3–74–103.

United States District Court, D. North Dakota, Southeastern Division.

May 3, 1976.

J. Gerald Nilles, Nilles, Hansen, Selbo, Magill & Davies, Ltd., Fargo, N. D., for plaintiff; Gordon J. Berg and John F. Hacking, Minneapolis, Minn., of counsel.

James D. Cahill, Garrity, Cahill, Gunhus, Streed, Grinnell & Jeffries, Moorhead, Minn., for defendant; Harold A. Halgrimson, Fargo, N. D., of counsel.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

Plaintiff, Jamestown Farmers Elevator, Inc., moves the Court for an order vacating judgment and granting a new trial in the above entitled case. The action was tried to a jury January 6 through January 9, 1976. Verdict was returned in favor of Defendant, General Mills, Inc., and against the Plaintiff, and for dismissal of the Plaintiff's complaint. Judgment was entered January 14, 1976. The Plaintiff's motion, pursuant to Rule 59 of the Federal Rules of Civil Procedure, was filed January 20, 1976, and alleges sixteen points of error on the part of the Court.

### FACTS

On or about February 1, 1973, in a telephone conversation between Patrick M. Kluempke, an agent of General Mills, and Donald Mutschler, as agent for the Plaintiff, an oral agreement was entered into whereby Mutschler agreed to sell and deliver to General Mills, and General Mills agreed to purchase and receive from Mutschler, 30,000 bushels of No. 2 barley, 45 lb. per bushel or better, at a price of $1.22 per bushel, f. o. b. Jamestown, North Dakota, delivery to be made by Mutschler during March and April of 1973 (hereinafter called the "delivery period"). Jamestown Farmers Elevator contended that General Mills, in addition, agreed to send twenty to twenty-five trucks and two rail cars to transport the barley. General Mills denied it agreed to send trucks. The oral agreement was followed by a written confirmation mailed by General Mills to Jamestown Farmers Elevator on or about February 1, 1973.

The written confirmation contained two terms which formed the principal dispute between the parties.

1. "Route—BN Rail"
2. "When shipments are not made according to contract, we reserve the right to extend time of shipment, cancel or buy in the grain for the seller's account, unless at seller's request previous to expiration of limit of shipment, other arrangements are made to cover seller's failure to make shipment within specified time of this contract."

Jamestown Farmers Elevator received the written confirmation but did not sign or return it, and did not notify General Mills of any objection to its terms prior to shipping 3,724 bushels of barley by rail in March, 1973. No further shipments by rail or truck were made during the March-April, 1973, delivery period.

The Plaintiff alleged that General Mills breached the contract on April 30, 1973, in having failed to deliver twenty to twenty-five grain trucks as allegedly prescribed by the oral contract. The failure is alleged by Jamestown Farmers Elevator to relieve them from any further obligation to deliver barley to General Mills.[1]

After the "delivery period" expired, no further shipments of barley were made by Jamestown Farmers Elevator to General Mills until February 18, 1974. On several occasions in the fall of 1973, General Mills sent grain trucks to the Plaintiff's elevator. Jamestown Farmers Elevator refused to load them. The parties corresponded a number of times both by telephone and by letter during the time leading up to the February, 1974, deliveries.

Again in February of 1974, General Mills caused trucks to be placed at Jamestown Farmers Elevator. And after discussions with General Mills representatives, Jamestown Farmers delivered an additional 22,-426 bushels of barley[2] between February 18, 1974, April 8, 1974. General Mills applied these deliveries to the February 1, 1973, contract and paid Jamestown Elevator the contract price of $1.22/bushel. The market price during those subsequent deliveries was about $3.22/bushel.

The Plaintiff alleged that by reason of Defendant's breach in failure to deliver grain trucks, the contract terminated April

30, 1973, and Jamestown Farmers Elevator was entitled to market price for deliveries made subsequent to that date. The difference between the market price and the contract price paid was approximately $2.00 per bushel. Plaintiff asked for $44,816.00 in damages. Defendant deducted from its remittance to Plaintiff the sum of $3,041.50, which represented the difference between the contract price and the April 19, 1974 market price on the 3,850 bushels that Plaintiff failed to deliver. Plaintiff claimed this deduction as an additional item of damages.

## LAW

■ A motion for a new trial is addressed to the sound discretion of the trial judge and wide latitude is accorded the trial judge in exercising that discretion. *Sanden v. Mayo Clinic,* 495 F.2d 221, 226 (8th Cir. 1974); *Novak v. Gramm,* 469 F.2d 430, 434 (8th Cir. 1972); *Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc.,* 466 F.2d 179, 185–186 (8th Cir. 1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973); *Silverthorn v. Hennigan,* 439 F.2d 704, 705 (8th Cir. 1971); *Bates v. Hensley,* 414 F.2d 1006, 1011 (8th Cir. 1969); *Farmers Cooperative Elevator Association Non-Stock of Big Springs, Nebraska v. Strand,* 382 F.2d 224, 230–231 (8th Cir. 1967), *cert. denied* 389 U.S. 1014, 88 S.Ct. 589, 19 L.Ed.2d 659 (1967); *Simpson v. Skelly Oil Co.,* 371 F.2d 563, 566–567 (8th Cir. 1967); *Bankers Life & Casualty Co. v. Kirtley,* 307 F.2d 418, 423 (8th Cir. 1962).

■ It is within the power of the Court to set aside a jury verdict which is contrary to the clear weight of the evidence. *White v. Mar-Bel, Inc.,* 509 F.2d 287 (5th Cir.

1. The complaint reads:
"During the delivery period the two rail cars were in fact loaded by Plaintiff with a total of 3,742 bushels of barley, but Defendant in breach of the contract wholly failed to cause the twenty-five grain trucks or any other type of adequate transportation to appear at Plaintiff's elevator at Jamestown to receive the remainder of the barley during the delivery period, although Defendant during said period reaf-

firmed from time to time its obligation and intention to do so.
Because of defendant's breach of the contract as hereinabove described, Plaintiff after April 30, 1973 was wholly released from any obligation thereunder to sell and deliver any more barley to Defendant."

2. Plaintiff claims the 22,426 bushels was malting barley as opposed to feed barley which was called for in the February, 1973 contract.

1975), *rehearing denied* 511 F.2d 1402 (5th Cir. 1975); *Nanda v. Ford Motor Co.,* 509 F.2d 213 (7th Cir. 1974). The standard for the Eighth Circuit was set out in *Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc.,* 466 F.2d 179, 187 (8th Cir. 1972), *cert. denied* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973).

> "The Fifth Circuit in *Cities Service Oil Co. v. Launey,* 403 F.2d 537 (1968), following *Hampton v. Magnolia Touring Co.,* 338 F.2d 303 (5 Cir. 1964), delineates a basis on which a trial court may require a new trial on the weight of the evidence. The court wrote:
>
>> 'Although the cases are not consistent in usage, some cases using the phrase "clear weight" and others using the phrase "overwhelming weight" or "overwhelming evidence", it seems clear that the jury's verdict must at least be against the *great* weight of the evidence before a new trial may be granted.' 403 F.2d at 540.
>
> Otherwise, the Fifth Circuit adds, it 'would destroy the role of the jury as the principal trier of the facts, and would enable the trial judge to disregard the jury's verdict at will.' We endorse these observations."

■ And in contrast to a motion for a directed verdict or a motion for judgment notwithstanding the verdict, a trial judge, in considering a motion for a new trial, is not required to take that view of the evidence which is most favorable to the nonmoving party. *Bates v. Hensley,* 414 F.2d 1006, 1011 (8th Cir. 1969); *Simpson v. Skelly Oil Co.,* 371 F.2d 563, 570 (8th Cir. 1967). Similarly, the weight of the evidence and possibly the credibility of witnesses may be considered. *See, Fireman's Fund Insurance Co., Inc., supra,* at 186; *U. S. v. Bucon Construction Co.,* 430 F.2d 420, 423 (5th Cir. 1970), *Simpson v. Skelly Oil Co., supra; Lind v. Schenley Industries, Inc.,* 278 F.2d 79 (3rd Cir. 1960), *cert. denied* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960); 6A Moore's Federal Practice ¶ 59.08[5]. Further, any other "pertinent matters" may be weighed and considered. *Simpson v. Skelly, supra.*

■ The discretion vested in the trial court is not without boundaries. *Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc., supra,* at 186. Particularly when considering an allegation of evidentiary error or error in instructions, it is generally held that a new trial should not be granted unless the moving party has met his burden of showing prejudicial error or it is reasonably clear prejudicial error has been committed or that substantial justice has not been achieved. *Midcontinent Broadcast Co. v. North Central Air., Inc.,* 471 F.2d 357, 359 (8th Cir. 1973); *Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc., supra,* at 186. In addition, a new trial should not be granted ". . . merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc., supra; See also, Cockrum v. Whitney,* 479 F.2d 84, 86 (9th Cir. 1973); *Passwaters v. General Motors Corp.,* 454 F.2d 1270, 1276 n.5 (8th Cir. 1972).

■ A major portion of the Plaintiff's alleged points of error relate to the Court's instruction to the jury. The purpose of instructions is to apprise the jury of the questions and issues involved and the applicable rules of law. *Ralston Purina Company v. Parsons Feed and Farm Supply,* 364 F.2d 57, 61 (8th Cir. 1966); *Weir v. Simmons,* 357 F.2d 70, 72 (8th Cir. 1966); *Terminal R. Ass'n. v. Howell,* 165 F.2d 135, 139 (8th Cir. 1948). It is proper for the Court to state the respective claims of the parties and, if there is evidence to support the proposition, each party is entitled to instructions on its theory of the case. *Gisriel v. Uniroyal, Inc.,* 517 F.2d 699, 703 (8th Cir. 1975); *Weir v. Simmons,* 357 F.2d 70, 72 (8th Cir. 1966); *Bern v. Evans,* 349 F.2d 282, 290 (8th Cir. 1965). The Eighth Circuit in *Gisriel v. Uniroyal, Inc., supra,* took note of the Tenth Circuit's standard, as set out in *Smith v. Mill Creek Court, Inc.,* 457 F.2d 589 (10th Cir. 1972), that *substantial evidence* must be introduced to warrant the giving of an instruction. The Court in *Smith* declared:

"The evidence introduced must warrant the giving of an instruction, *Bethel v. Thornbrough,* 311 F.2d 201 (10th Cir.); and it is error to give an instruction in the absence of evidence on the issue. The granting or denial of instructions in diversity cases is tested under the federal laws and federal rules, *Hopkins v. Metcalf,* 435 F.2d 123 (10th Cir.), while of course the substance of instructions is determined by state law. *There must be evidence which raises the issue as a real and substantial one; just a trace or innuendo is not a sufficient basis.* As we said in *F. W. Woolworth Co. v. Davis,* 41 F.2d 342 (10th Cir.): 'In the United States court, the rule is that there must be substantial evidence, as distinguished from a scintilla or modicum of evidence, to justify submission of a case to a jury.' *Citing Small Co. v. Lamborn & Co.,* 267 U.S. 248, 45 S.Ct. 300, 69 L.Ed. 597. Thus we must hold that the action of the trial court in its refusal to instruct on contributory negligence was not error." *Smith v. Mill Creek Court, Inc.,* 457 F.2d 589, 592 (10th Cir. 1972). (Emphasis added).

Finally, in the words of the Eighth Circuit, "it is a cardinal principle of federal jurisprudence that all of the instructions must be read together and as a whole." *Bennett v. First National Bank of Humboldt, Iowa,* 443 F.2d 518, 521 (8th Cir. 1971); *See also, Alabama Great Southern R. Co. v. Chicago & N. W. Ry. Co.,* 493 F.2d 979, 984 (8th Cir. 1974); *Gardner v. Meyers,* 491 F.2d 1184, 1188 (8th Cir. 1974); *Flentie v. American Community Stores Corporation,* 389 F.2d 80, 84 (8th Cir. 1968); *General Insurance Co. of America v. Herculus Construction Co.,* 385 F.2d 13, 24 (8th Cir. 1967); *Weir v. Simmons,* 357 F.2d 70, 74 (8th Cir. 1966); *Jiffy Markets, Inc. v. Vogel,* 340 F.2d 495, 500 (8th Cir. 1965).

## CONSIDERATION OF ALLEGED ERROR

Some of Plaintiff's alleged sixteen points of error overlap, and for that reason will be discussed generally, with appropriate reference to specific allegations.

### A. "Cover".

Jamestown Farmers charges the Court erred in not instructing the jury as a matter of law that General Mills covered the February 1, 1973 contract shortly after April 30, 1973, and the election to "cover" terminated any further obligation it might have had to subsequently deliver barley. To reach such a conclusion, the Plaintiff must argue from a position that Plaintiff breached the contract.

In considering Plaintiff's argument on "cover", it is noted initially that it was not pleaded. The thrust of the allegations of the complaint put forth to support Plaintiff's claim for relief was three-fold:

a. The oral agreement was the contract;

b. The Defendant breached the contract by its failure to provide trucks;

c. The Plaintiff was wrongfully coerced into making delivery.

The position which Plaintiff has taken on "cover" arises from its cross-examination of Patrick M. Kluempke, a former employee of Defendant, General Mills, who testified that General Mills, in this case, had followed a business practice, frequently used, of offsetting sales contracts entered into at the same time as the purchase contracts; that when Plaintiff failed to deliver by the end of the contract period, General Mills had to go out in the market to purchase barley to meet its sales commitments. Plaintiff argues this was an election of remedies under the U.C.C.[3]

---

**3.** The three statutes relating to buyer's remedies under the Uniform Commercial Code read as follows:

"41–02–91. (2–712) "Cover"—Buyer's procurement of substitute goods.—1. After a breach within the preceding section the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

2. The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (section 41–02–94), but less ex-

At the commencement of the trial, General Mills argued the written confirmation (Exhibit 1) was the entire contract and its terms could not be varied by any testimony on the oral agreement which preceded it. The Court concluded that testimony of an oral agreement would be allowed. The conclusion was based on a finding that the additions in the written confirmation relating to extension of time and the means of shipment might be determined by a jury to have materially altered the agreement and thereby NDCC 41-02-14 [4] was applicable. The parties agreed, and the evidence established, that this was a transaction between merchants.

These conflicting contentions presented a fact question as to what constituted the terms of the contract. The jury was instructed as to the parties' allegations and the applicable portions of NDCC 41-02-14. [5] Upon determining the terms of the contract, the jury was faced with the issue of whether the contract was breached, and if so, by whom. [6]

Jamestown Farmers does not allege that the Court improperly instructed the jury on its allegation that General Mills breached the contract. The alleged error is that the Court improperly instructed the jury on the legal effect of a breach of the contract by Jamestown Farmers. It is Jamestown Farmers' assertion that the buyer had among its remedies, assuming the seller was the breaching party, the election to "cover" and that it did in fact elect that remedy. The market price of barley at Jamestown, North Dakota, during the delivery period

---

penses saved in consequence of the seller's breach.

3. Failure of the buyer to effect cover within this section does not bar him from any other remedy."

"41-02-92. (2-713) Buyer's damages for nondelivery or repudiation.—1. Subject to the provisions of this chapter with respect to proof of market price (section 41-02-102), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this chapter (section 41-02-94), but less expenses saved in consequence of the seller's breach.

2. Market price is to be determined as of the place for tender or, in case of rejection after arrival or revocation of acceptance, as of the place of arrival."

"41-02-93. (2-714) Buyer's damages for breach in regard to accepted goods.—1. Where the buyer has accepted goods and given notification (subsection 3 of section 41-02-70) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

2. The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

3. In a proper case any incidental and consequential damages under the next section may also be recovered."

4. "41-02-14. (2.207) Additional terms in acceptance or confirmation.—1. A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

2. The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
  a. the offer expressly limits acceptance to the terms of the offer;
  b. they materially alter it; or
  c. notification of objection to them has already been given or if given within a reasonable time after notice of them is received.

3. Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title."

5. See Instructions 12 and 13. The Court has a policy of presenting instructions as to law and issues in its own language. In doing so, as long as the instructions are accurate and fair to both parties, the Court's wording may not be used as a basis for error. *Leathers v. U. S.,* 471 F.2d 856, 863 (8th Cir. 1972), *cert. denied* 412 U.S. 932, 93 S.Ct. 2754, 37 L.Ed.2d 161 (1973).

6. See Instruction 14.

was lower than the contract price of 1.22/bushel. Should General Mills be found to have "covered" within the meaning of NDCC 41–02–90, 91 and 92, it would have been unable to recover anything in damages from Jamestown Farmers. And most importantly, the contract would have been terminated. Any subsequent barley deliveries by Jamestown Farmers might arguably entitle them to the market price.

■ Plaintiff appears to overlook the fact that under the evidence, the jury had the task of determining the terms of the contract. The contract was either the oral agreement or the written confirmation. If the contract was the written confirmation as contended by the Defendant, and as the jury obviously found, the terms of that contract relating to buyers' remedies were controlling. Those remedies as already noted were expressed as follows:

"When shipments are not made according to contract we reserve the right to extend time of shipment, cancel or buy in the grain for the seller's account, unless at seller's request previous to expiration of limit of shipment, other arrangements are made to cover seller's failure to make shipment within specified time of this contract.

It is understood that this contract is not completed until all shipments are received, graded, weighed and accepted at destination or at point or points specified above." Plaintiff's Exhibit 1.

Under NDCC 41–02–91, "cover" is not a mandatory remedy and there was no evidence brought out at trial sufficient to support an instruction to the jury that Defendant, General Mills, canceled or bought in the grain *for Jamestown Farmers (seller's) account.* The evidence before the Court which could possibly relate to "cover" was that which was brought out on cross-examination of Kluempke to the effect that when Jamestown Farmers failed to deliver, General Mills had to buy barley on the market to meet its offsetting sale commitments, which commitments were entered into at the time it contracted with Jamestown Farmers to buy. The only one of plaintiff's

requested instructions filed with the Court which could be construed as a request for instruction on cover was worded:

"Even if you find Plaintiff breached the contract of the parties by delivering only 3,742 bushels of barley during the delivery period of March and April, 1973, this did not entitle Defendant to insist that Plaintiff deliver the remainder of the 30,-000 bushels of barley after April 30, 1973, and any such demand by Defendant to Plaintiff in October of 1973 or thereafter was without any color of right whatsoever, because after April 30, 1973, Defendant could only have damages against Plaintiff for breach of contract, and there were no damages recoverable by Defendant against Plaintiff because by stipulation of the parties, the market price of the barley at Jamestown, North Dakota during said delivery period was by stipulation of the parties lower than the contract price of $1.22 per bushel."

Plaintiff, reviewing the evidence in its post-trial brief, states that General Mills continued to demand delivery in May, 1973, July, 1973, October, 1973, November 1973, and again in 1974, after which delivery was made. On the evidence before the Court, the requested instruction was inappropriate. The evidence established that General Mills continuously treated the contract as having been extended.

### B. Issue of Unconscionability.

Plaintiff charges the Court erred both in ruling that the extension clause was not unconscionable and in failing to charge the jury that the extension clause was unconscionable. Section 41–02–19, NDCC, reads:

"41–02–19 (2–302) Unconscionable Contract or Clause.—1. If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2). When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

■ Subsection (1) assigns the issue of unconscionability exclusively to the court. It is the burden of the party alleging unconscionability to show the contract or clause of the contract was "unconscionable at the time the contract was made, not just that it was unconscionable by hindsight."[7] *Ray Farmers Union Elevator Co. v. Weyrauch,* 238 N.W.2d 47, 50 (N.D.1975).

The Code does not define "unconscionability" although the official comment to section 2–302 suggests:

"The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. Subsection (2) makes it clear that it is proper for the court to hear evidence upon these questions. The principle is one of the preventions of oppression and unfair surprise. Cf. *Campbell Soup Co. v. Wentz,* 172 F.2d 80, 3rd Cir. 1948) and not of disturbance of allocation of risks because of superior bargaining power."

The North Dakota Supreme Court in *Haugen v. Ford Motor Company,* 219 N.W.2d 462, 468 (N.D.1974) in discussing Section 41–02–19 (2–302), declared that a court's determination upon the issue of unconscionability should not be made without a hearing. In the instant case, the Court did allow the parties to submit evidence on the issue of unconscionability, making its ruling only after each party had rested their case.

The Court, based on this evidence as it related to the economic setting of the contract, ruled that the extension clause was not unconscionable. The Court left to the jury the issue whether the clause was a term of the contract and whether it in fact did extend the contract on May 1, 1973.[8]

NDCC 41–02–98 (2–719) specifically allows for additional remedies. The inclusion of the extension clause would have to be considered a remedy for the buyer. Both parties were merchants within the meaning of NDCC 41–02–04(1)(2–104(1) ). The Code holds the merchant to a higher standard than a consumer. And although a commercial setting does not necessarily bar a claim of unconscionability, "it is the exceptional commercial setting where a claim of unconscionability will be allowed. . . ." *County Asphalt, Inc. v. Lewis Welding & Engineering Corp.,* 323 F.Supp. 1300, 1308 (S.D.N.Y.1970).

■ Plaintiff failed to show that the Defendant employed any "oppressive tactics" resulting from an inequality of bargaining power. At the very best, the Plaintiff showed that Defendant may have enjoyed a somewhat superior bargaining power, which by itself raises no claim of unlawful coercion or duress. And the exercise of a superior bargaining power does not indicate unconscionability. Official Comment 1 to Uniform Commercial Code § 2–302.

■ Moreover, the record failed to show that any inequality of bargaining position resulted in the Plaintiff being *compelled* to accept the provisions. NDCC 41–02–14 (2–207) and the contract itself (Exhibit 1) allowed the Plaintiff to specifically reject terms it believed "materially altered" the contract.

---

7. As is seen in NDCC 41–02–19, the section authorizes three forms of relief: (1) The Court may refuse to enforce the entire contract, (2) or a part of it, or (3) the Court may limit the application of a particular clause to prevent an unconscionable result. In discussing those remedies, Summers & White, in their treatise on the Uniform Commercial Code, conclude, "it appears that the doctrine is in the nature of an affirmative defense and is not usually intended as a basis for damage recovery." White & Summers, Uniform Commercial Code, p. 116 (1st Ed.1972).

8. See Instructions 12 and 13.

■ Sufficient evidence was also presented to demonstrate extension clauses, such as the one employed in the written confirmation in this case, were clauses with which the Plaintiff was familiar and were normally employed in the grain business. *See,* NDCC 41–01–15 (1–205). The operation of such a clause, in the absence of a time provision, would be governed by reasonableness and good faith as expressed in NDCC 41–02–26 (2–309). The term, considered in the light of the general commercial background and the commercial needs of the grain business, was not "so extreme as to appear unconscionable according to the mores and business practices of the time and place." 1 Corbin, Contracts, § 128, p. 553 (1963). Plaintiff failed to present a case that the extension clause was unconscionable.

### C. Fraud

The Court finds there was no substantial evidence of fraud presented to raise an issue of fact for the jury.

### D. Economic Duress.

Jamestown Farmers also claimed that by reason of certain "threats" made by General Mills to Jamestown Farmers, Jamestown Farmers delivered 22,426 bushels of barley to General Mills during the period February 18, 1974, through April 8, 1974. For reasons previously discussed, Jamestown Farmers contended General Mills was not entitled to receive this barley and these "threats" constituted economic duress. In *Production Credit Assoc. of Minot v. Geving,* 218 N.W.2d 185 (N.D.1974), the Supreme Court of North Dakota made reference to the theory and noted the definition of the term as set out in 25 Am.Jur.2d "Duress and Undue Influence".

"Geving urges this court to adopt and apply in this case the doctrine of 'business compulsion' or 'economic duress.' Our research of this doctrine leads us to the conclusion that if it were to be accepted it would not be properly applicable in this case as PCA had every right to exert the pressure which it exerted as Geving was clearly in default. With respect to this doctrine, 25 Am.Jur.2d, Duress and Undue Influence, §§ 6, 7, pp. 361, 363 provide:

'There is no doubt that the early common-law doctrine of duress has gradually expanded and broken through its original limitations, and it is now recognized that undue interference with the conduct of a business or occupation may constitute duress. Many states have adopted the modern doctrine of 'business compulsion' or what is sometimes referred to as "economic duress or compulsion". * * *

* * * * * *

'To constitute business compulsion there must be more than a mere threat which might possibly result in injury at some future time, such as a threat of injury to credit in the indefinite future. It must be such a threat that, in conjunction with other circumstances and business necessity, the party so coerced would fear a loss of business unless he entered into the contract as demanded. The pressure must be wrongful, and not all pressure is wrongful. "Business compulsion" is not established merely by proof that consent was secured by the pressure of financial circumstances, or by the fact that one party insisted upon a legal right and the other party yielded to such insistence. * * *'" 218 N.W.2d 185, 195–196.

■ Assuming the Supreme Court of North Dakota has adopted the doctrine, Jamestown Farmers could recover under the theory only if it were able to prove it was not under a duty to deliver barley after May 1, 1973. The doctrine cannot be predicated upon a demand which is lawful. 25 Am.Jur.2d, Duress & Undue Influence, § 7, p. 364. In such a case, damages would be the amount by which the fair market value of the delivered barley as of the dates of delivery at Jamestown, North Dakota, exceeded the price that General Mills paid Jamestown Farmers for that barley. Instruction No. 14 given by the Court stated that if the jury found that General Mills

breached the contract, the Plaintiff, Jamestown Farmers, was entitled to damages. The damages were "the amount by which the fair market value as of the date of delivery of the barley delivered after March and April, 1973, exceeded the price that General Mills paid to Jamestown Farmers Elevator for the barley, . . . plus 3,041.50 which had been withheld by General Mills as damages for the undelivered barley." The Court concludes as a matter of law the actions of General Mills did not rise to "economic duress". However, such a determination is unnecessary since recovery under the theory could be had only if Jamestown Farmers was not under a duty to deliver. That contingency and the resulting damages were included in the Court's instructions.

### E. Punitive Damages.

The circumstances under which a jury may properly consider awarding exemplary damages are set out by statute. NDCC 32–03–07 provides:

"32–03–07. When jury may give exemplary damages.—In any action for the breach of an obligation not arising from contract, when the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant."

█ A jury may consider the issue of exemplary damages whenever the evidence allows a finding that

1) The action is one involving the breach of an obligation *not arising from contract;*

2) And that the defendant acted with oppression, fraud or malice.

█ At the close of the Defendant's case, the Court ruled that the action was one for the breach of an obligation arising from a contract, and therefore Plaintiff was not entitled to an instruction on the issue of exemplary damages.

Plaintiff's claim for punitive damages was founded upon the alleged threats of General Mills to put the plaintiff out of business if it refused to deliver barley based on the February 1, 1973, contract. As previously discussed, on the evidence in the case, to instruct the jury that on February 18, 1974, Plaintiff as a matter of law was under no obligation to deliver barley to the defendant, would have been error.

Plaintiff's complaint specifically alleges the Defendant breached its contract by failing "to cause the twenty-five grain trucks or other type of adequate transportation to appear at plaintiff's elevator at Jamestown . . . ."[9] And because of this breach of contract plaintiff was no longer obligated "to sell and deliver any barley to the Defendant . . . ."[10] Under NDCC 32–03–07 exemplary damages are "generally limited to recovery in an action growing out of a breach of contract *permeated with tort, where the injured party elects to waive the contract and recover in tort.*" *Campbell v. Wishek Public School District,* 150 N.W.2d 840, 842 (N.D.1967). (Emphasis added). In the instant case, it is quite obvious that Plaintiff did not waive the contract. The last count of the Amended Complaint, Count VII, relates to punitive damages and realleged the previous six counts, all of which were based on the allegation that General Mills breached its contract. Thus,

**9.** See note 1, supra.

**10.** Count III of the complaint, in its pertinent part, reads:
"Defendant after April 30, 1973 when Plaintiff's obligations under the contract had expired for the reasons hereinabove set forth, and beginning in October of 1973 represented to Plaintiff that Plaintiff was still obligated and legally bound under the terms of the February 1, 1973 contract, and pursuant to custom and usage of the grain trade, to continue making deliveries of barley to Defendant with the same force and effect as though said contract remained valid and unimpaired. These representations were false in that after April 30, 1973 Plaintiff was no longer obligated to sell and deliver any barley to Defendant at $1.22 per bushel or at any other price, and Defendant knew said representations were false, based on its special and expert knowledge gained of long and extensive experience in the grain trade."

the breach of contract theory was used by Plaintiff as the basis for Plaintiff's allegations that it was not obligated to deliver under the February 1, 1973, contract after April 30, 1973, and for its allegation that it was forced to deliver by reason of "fraud, coercion and oppression".

Plaintiff's theory, as pleaded, was not one involving the breach of an obligation *not* arising from contract. An instruction on punitive damages was not warranted.

Plaintiff offered a copy of General Mills Annual Report "May 27, 1974—May 25, 1975" to aid the jury in determining punitive damages.[11] Upon concluding that the Plaintiff was not entitled to an instruction on punitive damages, the Court excluded the exhibit as irrelevant and prejudicial.

### F. Burden of Proof.

■ The Plaintiff contends the Court's Instruction 15 on burden of proof was "out of the ball park" because Plaintiff did not "claim that it suffered any monetary damages from General Mills' failing to place trucks at Jamestown during the delivery period". Plaintiff's argument is without merit. Obviously counsel did not read Instructions 14 and 15 together. The instructions must be read as a whole, and the Court concludes if the instructions are so read, they adequately instructed the jury on the issues presented at trial.

### G. "Voir Dire".

■ Plaintiff also alleges the Court erred in failing to inquire whether any jurors or members of their families owned stock or were employed by General Mills. The voir dire was directed toward the duty of a juror to be impartial. After completing voir dire, the Court asked both parties whether they desired any additional questions. The Plaintiff offered none, nor has he made a showing that prejudicial error resulted from the omission of any voir dire questions. A new trial should not be granted where the Plaintiff has failed to meet his burden of showing prejudicial error. *Mid-*

*continent Broadcast Co. v. North Central Airlines, Inc.,* 471 F.2d 357, 359 (8th Cir. 1973); *Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc.,* 466 F.2d 179, 186 (8th Cir. 1972), *cert. denied* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973).

■ Rule 47 of the Federal Rules of Civil Procedure allows the trial judge great discretion in determining the competency of jurors. *U. S. v. Bear Runner,* 502 F.2d 908, 911 (8th Cir. 1974); *Labbee v. Roadway Exp., Inc.,* 469 F.2d 169, 172 (8th Cir. 1972). There was no abuse of that discretion in failing to submit a question to the jury which the Plaintiff considered relevant only after the trial of the lawsuit. Plaintiff assumes a juror who may own stock or work for General Mills would naturally prejudice its case. The Eighth Circuit has recently rejected "the '*per se* theory of implied bias' in favor of a requirement that actual prejudice be demonstrated", *U. S. v. Kelton,* 518 F.2d 531, 533 (8th Cir. 1975). Standing alone, such interest, if it did in fact exist, would not support the required finding of prejudice.

### H. Amount of Grain Delivered.

■ Prior to trial, both parties stipulated that during the contract delivery period, February 1, 1973—April 30, 1973, Plaintiff delivered 3,724 bushels of barley to Defendant. At trial, Plaintiff sought to prove delivery of 4,188 bushels. Defendant offered an explanation for the apparent discrepancy. In spite of the stipulation and the explanation, Plaintiff's counsel argued the matter to the jury, and now alleges the Court should have instructed the jury on the point, although he did not request an instruction and does not now suggest what the instruction should have been. The point is frivolous.

### I. Weight of the Evidence.

■ Plaintiff further contends that the jury's findings are against the greater weight of the evidence. This contention is without merit. There is substantial evi-

11. The exhibit was received on an offer of proof. See Exhibit 35.

dence to support the verdict. In addition, although different inferences or conclusions could have been drawn, ". . . there exists no significant weight factor favoring the [plaintiff]." *Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 187 (8th Cir. 1972), *cert. denied* 410 U.S. 930, 95 S.Ct. 1371, 35 L.Ed.2d 592 (1973).

In reviewing the evidence and all relevant factors, the Court concludes the Plaintiff has failed to show, nor is it reasonably clear, that the verdict is against the clear weight of the evidence. In addition, the record fails to disclose any prejudicial error or substantial injustice so as to warrant the granting of a new trial.

IT IS ORDERED Plaintiff, Jamestown Farmers Elevator's, motion for an order vacating judgment and granting a new trial pursuant to Rule 59, is DENIED.