706 P.2d 1028 (1985)
RESOURCE MANAGEMENT COMPANY, a Utah Corporation, Plaintiff and Appellant,
v.
WESTON RANCH AND LIVESTOCK COMPANY INC., George W. Weston, Theda M. Weston, Norman E. Weston, Nethelle W. Weston, J. Simeon Weston, Reta W. Weston, Forty-six Company, Inc., Diamond W. Ranch Company, Inc., and Morrell Weston & Sons Ranching Company Inc., and John Does 1 through 5, Defendants and Respondents.
No. 18387.
Supreme Court of Utah.
August 23, 1985.
*1031 Michael J. Mazuran, Salt Lake City, for plaintiff and appellant.
Bryce E. Roe, Robert Adkins, Salt Lake City, for defendants and respondents.
STEWART, Justice:
The plaintiff, Resource Management Co. (RMC), sued for a decree of specific performance directing defendants, the Westons, to convey to RMC certain oil and gas royalty rights pursuant to the terms of a contract. The trial court ruled against RMC holding that the contract was unenforceable because (1) there was "no bargained for consideration received by defendants in exchange for their promises" and (2) even if the consideration for the contract were not illusory, the contract was unconscionable because "the consideration promised by plaintiff for defendant's royalty and mineral interests was grossly inadequate." RMC appeals.

I. THE FACTS
Defendants George W. Weston, Norman E. Weston, J. Simeon Weston and Morrell Weston ("the Westons") are brothers engaged in the ranching business. Collectively, they own and manage over 8,000 acres of ranch land located in Rich County, Utah. The Westons were the principal shareholders and officers in Weston Ranch and Livestock Co., Inc.[1]
Sometime in mid-1974, the Westons began to receive contacts from land men interested in leasing the Westons' property for purposes of oil and gas exploration. In August, 1974, two of the brothers entered into an oil and gas lease with Ram Petroleum. Norman Weston leased 722 acres, and Simeon Weston leased 400 acres for $1 per acre bonus, $1 per acre annual rental, and the reservation of a 12½% royalty. Neither brother engaged in any negotiation concerning the terms of the lease except that Norman insisted that the term of his lease run five years, instead of ten. According to Simeon Weston, negotiations concerning his lease started "about the same time that they were completed, really." For both, it was the first oil and gas lease they had ever negotiated.
RMC is a closely held Utah corporation in the business of providing consulting and management services to persons owning land having mineral potential. Its president and principal shareholder is William A. Stevenson, who in one capacity or another has been involved in the oil and gas business since 1957.
William Stevenson and Simeon Weston first met at a cattlemen's convention in Salt Lake City sometime prior to September, 1974. Stevenson explained to Weston the nature of his business. Simeon later agreed to arrange a meeting between Stevenson and his brothers. The record is not entirely clear, but apparently there were two meetings between Stevenson and the Westons. The first, on September 19, was apparently informal, and the terms of an agreement were discussed only generally. On September 20, the Westons and Stevenson, accompanied by Gerald Miller, who at the time was considering an offer of employment *1032 from RMC, met at an unoccupied ranch house owned by the Westons. By all accounts, the meeting lasted several hours, taking up most of the afternoon. At the meeting, Stevenson attempted to sell the Westons on the contract. According to the trial court's findings, Stevenson represented to the Westons that by entering into a contract with RMC, RMC's knowledge and skill, its services in preparing surveys and evaluations, and its help in negotiating leases would greatly enhance the value of the Westons' property and would make them wealthy. Stevenson had in his possession at least one copy of a blank form contract that he had apparently used on numerous previous occasions.[2] The contract set forth the terms of the agreement on two legal-size sheets of paper.
The testimony is in conflict as to what occurred during the meeting. Stevenson read through either all or most of the contract provisions but did not elaborate or endeavor to explain any provisions unless one of the Westons specifically requested him to do so. Though one of the brothers testified that he supposed they could have had copies of the contract to read through had they asked, none of the Westons read through the contract at the meeting.
The Westons did not agree to all the terms of the contract. Specifically, they insisted that paragraph 3 be changed. In its original form, this paragraph granted RMC an option to extend the contract for an additional five years beyond its initial five-year period. The provision was modified by deleting the option to extend.[3] As modified, paragraph 3 is not necessarily consistent with paragraph 9, which provides that "the term of this Agreement and any extensions thereof shall be automatically extended to coincide with the longest term of any agreement entered between the OWNERS and any third parties regarding any mineral or mineral rights covered by the terms of the Agreement." The parties did not discuss the possible conflict between the two provisions.
During the meeting, Norman Weston indicated that his property was not to be included in the contract, as it was already leased to another oil company. However, there is contrary testimony by Stevenson indicating that he thought the property was to be included, but only to the extent of non-oil and gas minerals that might be located on the property.
The primary obligations of the parties were embodied in paragraphs 12 and 5 of the contract. Paragraph 12 enumerated the obligations of RMC under the contract:
12. THE COMPANY agrees:
(a) To make a preliminary geological evaluation of the subject real properties covered by this Agreement.
(b) To prepare applicable preliminary maps and sketches.
(c) When requested by the OWNERS to prepare a preliminary report to the OWNERS covering such evaluation.
(d) To confer with the OWNERS concerning results of preliminary investigations and evaluations.
(e) To make general recommendations to the OWNERS after considering the objectives and desires expressed by the OWNERS.
(f) To provide, when requested, an annual re-evaluation of the mineral potential of the real properties covered by this Agreement.
(g) When requested by the OWNERS, to provide submittals and proposals to companies and operators which might be interested in the mineral potential of the subject real properties.
(h) When requested by the OWNERS, to negotiate with such companies and operators in an attempt to obtain satisfactory sales, leases or working arrangements. *1033 It is expressly understood that the extent and scope of geological evaluations and the preparation of attendant materials, shall be at the sole discretion of THE COMPANY, and that failure of THE COMPANY to make any specific, detailed study or evaluations of the real properties covered by the Agreement, except as hereinabove provided, shall not be cause for termination of this Agreement by OWNERS.
In return, the Westons agreed, in paragraph 5, to compensate RMC as follows:
5. The consideration which OWNERS agree to pay to THE COMPANY for the consulting service of THE COMPANY hereunder, shall be as follows:
(a) OWNERS shall, upon execution of this Agreement by THE COMPANY, execute a Royalty Deed[4] conveying to THE COMPANY an undivided two percent (2%) interest in and to all of the oil, gas, oil shale, bituminous sandstone, and all other hydrocarbons produced, mined and saved and an undivided one percent (1%) interest in and to all other minerals, including all heat, steam, hot water or other geothermal power produced, mined and saved from the foregoing described properties; plus
(b) on all oil, gas, oil shale, bituminous sandstone and all other hydrocarbons produced, mined and saved, thirty-one percent (31%) of the royalties in excess of and above fourteen and one-half percent (14½%) reserved and received above by the OWNERS, plus thirty-one percent (31%) of all cash or other income or consideration received above by the OWNERS from the sale, leasing, or other development of the minerals underlying the real property covered by this Agreement regardless of the form in which such payment or consideration are [sic] received; plus (c) on all other minerals, including but not limited to, all heat, steam, hot water or other geothermal power produced, mined and saved, thirty-one percent (31%) of the royalties in excess of and above six percent (6%) reserved and received by the OWNERS from the sale, leasing or other development of the minerals underlying the real property covered by this Agreement regardless of the form in which such payment or consideration are [sic] received.
Other contractual provisions pertinent to this litigation include paragraphs 7, 9, 13, 16 and 30.
7. The OWNERS agree to notify THE COMPANY of all agreements which they entered into during the term of this Agreement, including but not limited to, sales of mineral leases involving land covered by this Agreement.
9. The term of this Agreement and any extensions thereof shall be automatically extended to coincide with the longest term of any agreement entered into between the OWNERS and any third parties regarding any minerals or mineral rights covered by the terms of this Agreement.
13. THE COMPANY shall continue throughout the term of this Agreement and any extensions thereof, without cost to the OWNERS and when requested by the OWNERS, to consult with, advise and assist the OWNERS in their efforts to manage and/or develop the mineral *1034 potential of the lands covered by this Agreement.
16. It is agreed and understood by the parties that THE COMPANY may, at any time, in its sole discretion, terminate this Agreement in the event it determines there is not sufficient promise of minerals of commercial value on the subject properties covered by the Agreement, sufficient to justify the further expenditures of time or money by THE COMPANY.
30. It is expressly understood that the relationship created under this Agreement is that of THE COMPANY as a consultant to the OWNERS for the sole purpose of assisting the OWNERS in the management and development of the mineral rights of the OWNERS, and that nothing contained in this Agreement shall be construed to create any other relationship or oblige THE COMPANY to the expenditure of any money for any purpose except as specified in paragraph 12 above.
Following the close of the September 20 meeting, Stevenson and Miller retired to a motel room where, using tax deeds supplied to them by the Westons, they prepared a list of all properties covered by the contract. The contract was signed the following day by George Weston, as secretary of the corporation, and by Norman Weston, as its president. The Westons stipulated at trial that the contract was duly executed.
Soon after the September 21 signing, Stevenson sent, by registered mail, a letter to Norman and George Weston, confirming RMC's approval of the contract and requesting the Westons to acknowledge that they understood all the provisions of the contract, particularly paragraphs 5 and 12, before signing it. The acknowledgement form provided by RMC went unsigned and unreturned.
In December, 1974, Stevenson wrote to the Westons to inform them that a well was being drilled by American Quasar Company in neighboring Summit County. Stevenson recommended that the Westons offer their lands for a 10-year lease at a minimum first year bonus of between $3 and $5 an acre, an annual rental of $1 per acre, and a reserved royalty of 15%p1/2% to 17½%. Stevenson also requested permission to delay submittal of the Westons' property on the expectation that a better return could be realized later. Norman Weston granted permission by return mail.
For several months, there was no communication between RMC and the Westons. In March, 1975, Norman Weston entered into four leases for four parcels of Weston Ranch land totaling just over 2,000 acres, to Cities Service Oil Company. The lease provided for bonuses ranging from $1 per acre to $3 per acre, a $1 per acre rental, and a 12½% royalty. The leases were signed by George Weston, as secretary of the corporation, when presented to him by Norman for his signature.[5] Through March, 1975, George Weston conceded that he thought the Westons had a valid contract with RMC. Nevertheless, neither RMC nor Stevenson was informed of the four Cities Services leases, as required by paragraph 7 of the contract. In fact, Stevenson did not learn of them until almost a year later.
By April or May of 1975, George Weston, prompted by the comment of a land man that he didn't think the contract was legal, and perplexed by a several-month lapse without hearing from Stevenson, apparently began to question the validity of the contract. So he took a copy of the contract to his lawyer, George Preston of Logan, Utah, and asked him to examine it. On May 9, 1975, Preston informed Stevenson by letter that the contract was not valid because it had not been properly executed or approved by the corporation, it had not been acknowledged as requested, and that it had been breached by RMC. Stevenson responded that RMC considered the contract binding, pointed to George and Norman *1035 Westons' signatures on behalf of the corporation, and informed Preston that RMC had done considerable work in offering oil and gas leases on the Westons' land and that RMC had performed its obligations under the contract. He closed by welcoming suggestions as to how he might better help the Westons. Preston then informed Stevenson that since Stevenson considered the contract binding, the Westons would request performance on it. Preston enclosed a proposed lease agreement and an offer to lease which had been sent to the Westons and requested Stevenson's advice as to whether it should be accepted. Preston made the following specific request:
Please, therefore, examine for consideration the oil and gas lease tendered herewith by City [sic] Service Oil Company and the attached letter from Mr. N.F. Taylor of that company as it relates to the Weston's property. The Westons desire to be advised concerning the consideration and its adequacy and each of the facts concerning the property listed under paragraph 12 of the agreement.
A second letter from Preston to Stevenson, dated July 14, 1975, requested Stevenson's evaluation of a lease agreement offered by J.W. Bloom, covering the entire Weston Ranch. Stevenson examined the leases, pointed out several provisions that would operate to the Westons' disadvantage if accepted, and recommended certain changes. Stevenson also recommended that the properties be offered to another company at more attractive terms. On July 29, 1975, Preston again wrote to Stevenson, thanked him for the advice received and directed him to prepare a lease agreement, consistent with his earlier recommendations, for submittal to American Quasar Petroleum Co. Stevenson refused, on the grounds that preparation of leases was work properly done by a lawyer, he was not a lawyer, and he had not agreed to perform legal services.
Earlier in the month of July, Stevenson sent what purported to be a preliminary geological survey and accompanying maps from RMC. However, what they received was not what they anticipated; indeed, it is doubtful that it could reasonably be construed to constitute compliance with any of RMC's obligations under paragraph 12 of the contract. The report consisted of "a photocopy of a map of northeastern Utah including the area north of Provo to the Idaho border and east therefrom to include Cache, Rich, Morgan, Summit, parts of Davis, Salt Lake, Wasatch, Duchesne and Uintah Counties in Utah, and Lincoln County in Wyoming, all on two 8½ × 11 inch sheets scotch taped together with some notations and general locations of properties thereon." The accompanying preliminary geological evaluation, three pages in length, contained data and recommendations concerning different tracts owned by the Westons. The evaluation was in the most general terms, such as "there is no reason to believe these lands do not have a potential for oil and gas production, and there is a small potential that the surface exposed rocks could overlie an area of potential," and "the remaining lands west of the fault appear to have some potential for hydrocarbon entrapment."
Between August and the end of the year, Stevenson received two letters from Preston complaining of Stevenson's failure to act with respect to the earlier lease offers. Stevenson tried to call Preston after one of the letters but was unable to find him in his office, and Preston's letters went unanswered. During this period, however, Stevenson phoned George Weston on several occasions and they discussed drilling activity in neighboring areas. During this time, Stevenson also prepared and forwarded a submittal of the Westons' and other clients' properties to over 200 companies nationwide. The submittals stimulated some interest in the properties but yielded no affirmative results.
In late January, 1976, Stevenson informed George Weston of the Rikeman strike in nearby Wyoming and predicted that leases would soon bring up to $25- to $50-per-acre bonuses. According to Stevenson, George asked how long it would be *1036 before bonuses reached that level. Stevenson replied six months or longer. A letter dated February 5, 1976, followed, in which Stevenson again included information on the recent discovery and again predicted bonuses of $25 to $50 an acre along with an 18¾% royalty.
Sometime in early 1976, apparently in mid or late January, George Weston, in the course of a phone conversation with Stevenson, asked Stevenson when he was going to get the Westons' land leased. Stevenson replied, according to Weston, that if he would read the contract, he would discover that Stevenson had no obligation to do anything. Shortly thereafter, on February 5, George Weston leased 5,325 acres to Fred Betz and received a bonus of $7 per acre. Although it is disputed as to whether Weston used Stevenson's advice to work Betz's bid up to $7, it is undisputed that Betz's initial offer was for either a $2- or $3-an-acre first-year bonus.
On February 18, 1976, in the course of a phone call placed by Stevenson, Weston told Stevenson about the Betz lease. Stevenson was furious, complaining that he lost $100,000 as a result of that lease. Stevenson subsequently demanded an accounting of monies due him under the contract. The Westons, through their attorney Preston, responded that no payment was due because (1) Stevenson had misrepresented the terms of the contract; (2) the Weston Ranch, as a corporation, had never adopted a resolution ratifying the contract; and (3) RMC had breached the terms of the contract. Efforts to settle the dispute failed, and this litigation ensued.
On this appeal, RMC contends that the trial court erred in ruling that RMC's promises constituted illusory consideration and that the contract was unconscionable. RMC also contends that (1) even if the contract is unconscionable, equity should not permit that ruling to itself cause an unconscionable result to RMC; (2) the Westons are estopped to deny the validity of the contract; (3) the Westons waived any defects in the contract by repeatedly requesting further performance from RMC; and (4) the Westons are prevented by laches from now raising their defenses to the contract.

II. CONSIDERATION FOR THE WESTONS' PROMISES
The trial court concluded that RMC's promises were illusory and, that "there being no bargained for consideration received by defendants in exchange for their promises," the contract was unenforceable. We disagree with the trial court's conclusion.
The law does not enforce all promises. For a promise to be legally enforceable, it must be supported by consideration. Manwill v. Oyler, 11 Utah 2d 433, 436, 361 P.2d 177, 178 (1961); 17 C.J.S. Contracts § 71 (1963). Consideration is an act or promise, bargained for and given in exchange for a promise. Simmons v. California Institute of Technology, 34 Cal.2d 264, 272, 209 P.2d 581, 586 (1949); See Colorado National Bank of Denver v. Bohm, 286 F.2d 494, 496 (9th Cir.1961). Promises made by a party pursuant to a bilateral contract to do an act or to forbear from doing an act that would be detrimental to the promisor or beneficial to the promisee may constitute the consideration for the other's promise. Sugarhouse Finance Co. v. Anderson, Utah, 610 P.2d 1369, 1372 (1980); Allen v. Rose Park Pharmacy, 120 Utah 608, 613, 237 P.2d 823, 825 (1951). For the mutual promises of the parties to a bilateral contract to constitute the consideration for each other, the promises must be binding on both parties. Meurer Steel Barrel Co. v. Martin, 1 F.2d 687, 688 (3d Cir.1924).
When there exists only the facade of a promise, i.e., a statement made in such vague or conditional terms that the person making it commits himself to nothing, the alleged "promise" is said to be "illusory." An illusory promise, neither binds the person making it, 1 Corbin on Contracts § 145 (1963), nor functions as consideration for a return promise. Id. at 628. Thus, if RMC's contractual promises are illusory, as the Westons contend, the Westons' promises *1037 would not be supported by consideration.
In arriving at its conclusion that RMC's promises were illusory and therefore not consideration for the Westons' promises, the trial court focused on RMC's right to terminate the contract stated in paragraph 16 of the contract. Reservation of an absolute and unconditional power to terminate an executory contract in which the mutual promises of the parties provide the sole consideration renders the contract unenforceable because there is no mutuality of consideration or, as is sometimes said, no "mutuality of obligation." Barton v. Bechtel Corp., 253 F. Supp. 288, 294 (N.D. Cal. 1965); Naify v. Pacific Indemnity Co., 11 Cal.2d 5, 76 P.2d 663, 667 (1938); Eaton Factors Co. v. Bartlett, 24 Conn. Supp. 40, 186 A.2d 166, 168 (1962); Midwest Management Corp. v. Stephens, Iowa, 291 N.W.2d 896, 912-13 (1980); 1 S. Williston, The Law of Contracts § 105, at 418 (3d ed. 1957); 17 Am.Jur.2d Contracts § 496 (1964); 17 C.J.S. Contracts § 100(6), at 806-07 (1963).
The promisor, by reserving an arbitrary right to terminate the contract, can unilaterally negate his promises. Thus, a negatable promise does not constitute consideration for a return promise for an executory contract. If, however, one party reserves the right to terminate a contract upon the occurrence of a condition subsequent, the contract is not unenforceable ab initio for lack of mutuality of consideration. Pease v. Brown, 186 Cal. App.2d 425, 8 Cal. Rptr. 917 (1960); Vitagraph Inc. v. Liberty Theatres Co., 197 Cal. 694, 242 P. 709 (1925); Omni Group, Inc. v. Seattle-First National Bank, 32 Wash. App. 22, 645 P.2d 727 (1982); 1A Corbin on Contracts § 265 at 536 (1963); 1 S. Williston, The Law of Contracts § 105, at 418-19 (3d ed. 1957); 17 C.J.S. Contracts § 100(6), at 809 (1963).
RMC's right of termination in paragraph 16 is conditioned on the occurrence of a condition subsequent: the determination that "there is not sufficient promise of minerals of commercial value... sufficient to justify the further expenditures of time or money by THE COMPANY." However, that determination is to be made in the "sole discretion" of RMC. Notwithstanding the breadth of that power, it may not be exercised capriciously or in bad faith.
The Westons' argument that the literal meaning of "sole discretion" confers an arbitrary power to avoid all obligations under the contract is without merit. The law generally imposes a duty to perform contractual obligations in good faith. E.g., Leigh Furniture and Carpet Co. v. Isom, Utah, 657 P.2d 293, 311 (1982); Rio Algom Corp. v. Jimco, Ltd., Utah, 618 P.2d 497, 505 (1980); W.P. Harlin Construction Co. v. Utah State Road Commission, 19 Utah 2d 364, 431 P.2d 792, 793 (1967). Thus, an implied covenant of good faith forbids arbitrary action by one party that disadvantages the other. See W.P. Harlin Construction Co. v. Utah State Road Commission, supra, 431 P.2d at 793. Accordingly, courts endeavor to construe contracts so as not to grant one of the parties an absolute and arbitrary right to terminate a contract. Midwest Management Corp. v. Stephens, supra, 291 N.W.2d at 913; Miller v. O.B. McClintock Co., 210 Minn. 152, 297 N.W. 724, 729 (1941); Fulcher v. Nelson, 273 N.C. 221, 159 S.E.2d 519, 522 (1968); 1 S. Williston, The Law of Contracts § 105, at 418-19 (3d ed. 1957); 17 Am.Jur.2d Contracts § 496 (1964).
In Richard Bruce & Co. v. J. Simpson & Co., 40 Misc.2d 501, 243 N.Y.S.2d 503 (1963), the contract entered into by the parties included a provision that read, "[T]he Underwriter shall have the right to terminate this Agreement at any time ... if prior to the effective date the Underwriter, in its absolute discretion, shall determine that market conditions or the prospects of the public offering are such as to make it undesirable or inadvisable to make or continue the public offering hereunder." The court opined that the provision granted the underwriter only a discretion "based on fair dealing and good faith" and held that the clause did not render the underwriter's promise illusory and the contract unenforceable. *1038 Similarly, in Blish v. Thompson Automatic Arms Corp., 30 Del. Ch. 538, 64 A.2d 581, 597 (1948), the court held that although an underwriting contract gave the underwriter the right to cancel the contract if, in its "absolute judgment," the offering was impractical or inadvisable, the term "absolute judgment" contemplated a "judgment based upon sincerity, honesty, fair dealing and good faith, not one evidencing caprice or bad faith." Accordingly, the court rejected the claim that the contract was invalid because it lacked mutuality.
The validity of a stock subscription agreement was scrutinized in Midwest Management Corp. v. Stephens, supra, 291 N.W.2d 896, where the contract contained a clause permitting Midwest to cancel the agreement at any time if, among other reasons, that party "in its sole discretion" determined any representation made by the buyer to be incorrect. The court stated, "Even though the contract purports to leave the determination of one of the conditions to the `sole discretion' of Midwest, we do not believe that such discretion could be exercised arbitrarily. Midwest would have had to exercise that discretion in a reasonable manner on the basis of fair dealing and good faith." 291 N.W.2d at 913.
In summary, the reservation by a promisor of a power to cancel upon the occurrence of some event not wholly controlled by the promisor himself does not render his promise illusory or the contract invalid. "Even if the promisor is himself to be the judge of the cause or condition, he must use good faith and an honest judgment." 1A Corbin on Contracts § 165, at 86-87 (1963). See also Smith, Batchelder & Rugg v. Foster, 119 N.H. 679, 406 A.2d 1310 (1979) (provision in written employment contract permitting employer to terminate the contract if dissatisfied with employee's work did not render employer's promise illusory because of implicit requirement that employer, in good faith, be dissatisfied with employee's work, when and if termination option was exercised); City of Bowling Green v. Knight, 216 Ky. 838, 288 S.W. 741, 742 (1926) (sewer construction contract authorizing city engineer to cancel contract at any time "he decided" work not progressing satisfactorily held to imply a requirement that engineer exercise his option in good faith and on reasonable grounds; engineer could not arbitrarily or capriciously exercise judgment); R.J. Cardinal Co. v. Ritchie, 218 Cal. App.2d 124, 32 Cal. Rptr. 545 (1963) (right to terminate contract "for cause" or "good cause" meant upon reasonable grounds assigned in good faith; it did not permit the party having power to invoke clause to do so at his pleasure and did not confer an arbitrary and absolute power to cancel); J. Calamari & J. Perillo, Contracts § 4-16 (2d ed. 1977).
On the authority of the above precedents, we hold that paragraph 16 of the contract did not give RMC an arbitrary, unfettered right to unilaterally terminate its contract with the Westons. RMC's right to terminate was circumscribed by the requirement that it exercise it in good faith, in this case, only on a reasonable belief that the commercial and mineral value of the property would not justify further performance on the contract.
None of the cases cited by the Westons involved contracts reserving to either or both parties a right to terminate the contract at will, either on occurrence of a condition subsequent or otherwise. Three of the cases support propositions with which we are in agreement: that where the promisor retains an unlimited right to decide the nature or extent of his performance, the promise is illusory and too indefinite for legal enforcement, Davis v. General Foods Corp., 21 F. Supp. 445 (S.D.N.Y. 1937), and that consideration is an act or promise bargained for and given in exchange for a promise, Simmons v. California Institute of Technology, 34 Cal.2d 264, 209 P.2d 581 (1949); Colorado National Bank of Denver v. Bohm, 286 F.2d 494 (9th Cir.1961). In reference to the first proposition, we believe that the promises embodied in paragraph 12, clauses (a) *1039 through (h), are reasonably specific and amenable to judicial interpretation. Certainly they do not approach the nebulous character of the alleged promise in Davis. In regard to the second proposition, the obligations of the respective parties are adequately set forth in paragraphs 5 and 12 of the contract.
The Westons cite Simmons and Colorado National Bank to emphasize that the "minimal tasks" performed by RMC "would not make the contract enforceable, because the tasks were not what were bargained for." With that much we agree. However, as the Westons also state, "The Westons bargained for Resource Management Company's promise to perform consulting and management services for them." Id. at 30. Because we do not share the Westons' view that the termination provision rendered RMC's promises to consult and manage illusory, we need not, and do not, look any further than the promises of RMC to find consideration for the Westons' counterpromises.
The Westons also rely on Interchange Associates v. Interchange, Inc., 16 Wash. App. 359, 557 P.2d 357 (1976), wherein defendants promised to serve as directors for ten years or until their earlier resignation. Analogizing defendants' promise to a reservation of "an unconditional right to terminate the contract," the court held the contract invalid. Id. at 358-59 (emphasis added). As we have noted above, however, we are of the opinion that paragraph 16 of the contract in this case did not afford RMC the right to unconditionally terminate the contract.
Finally, it should be noted that the Westons twice cite Williston, as quoted in other opinions, to argue for the conclusion that this contract is invalid. Considered in context, however, Williston may be read to support the counter proposition. Williston is first quoted as stating: "One of the commonest kinds of promises too indefinite for legal enforcement is where the promisor retains an unlimited right to decide later the nature or extent of his performance. This unlimited choice in effect destroys the promise and makes it merely illusory." 1 S. Williston, The Law of Contracts § 43, at 140 (3d ed. 1957) (footnotes omitted), quoted in Davis v. General Foods Corp., supra, 21 F. Supp. at 446. In illustrating the point, however, Williston goes on to state in the next sentence:
Thus an agreement to pay such wages as the employer wishes is invalid, though an agreement to pay such wages as the employer considers "right and proper" is not too uncertain, since performance of such a promise does not leave the promisor free to do as he may choose. He must in good faith make an honest estimate of what is proper.
1 S. Williston, supra, § 43, at 140-41 (emphasis added, footnotes omitted). Specifically with respect to the reservation of a termination right in a contract, Williston explains two paragraphs later that "[i]f one party to an agreement reserves an unqualified right to cancel the bargain, no legal rights can arise from it while it remains executory." Williston, supra, § 43, at 143 (emphasis added). Thus, a promise is made illusory and a contract rendered invalid, according to Williston, by the reservation in one of the parties of an unqualified right of termination. Also cited is Williston's view, "[t]hat a promise which in terms reserves the option of performance to the promisor is insufficient to support a counter-promise is well settled.... An agreement wherein one party reserves the right to cancel at his pleasure cannot create a contract." 1 S. Williston, supra, § 105, at 417-18 (3d ed. 1957), quoted in Interchange Associates v. Interchange, Inc., supra, 557 P.2d at 359.[6] In the next sentence, however, Williston states:
Since the courts, however, do not favor arbitrary cancellation clauses, the tendency is to interpret even a slight restriction on the exercise of the right of cancellation as constituting such legal detriment as will satisfy the requirement of *1040 sufficient consideration; for example, where the reservation of right to cancel is for cause, or by written notice, or after a definite period of notice, or upon the occurrence of some extrinsic event, or is based on some other objective standard.

1 S. Williston, supra, § 105, at 419-20 (emphasis added, footnotes omitted).
The trial court, in branding RMC's promises "illusory," also attached secondary significance  though it is not clear from the findings of fact and conclusions of law how much  to the last sentences of paragraph 12 and paragraph 30. The final sentence of paragraph 12 declares:
It is expressly understood that the extent and scope of geological evaluations and the preparation of attendant materials, shall be at the sole discretion of [RMC], and the failure of [RMC] to make any specific, detailed study or evaluations of the real properties covered by this Agreement, except as herein provided, shall not be the cause for termination by [the Westons].
Unquestionably, this provision limits the potential usefulness of the promised preliminary geological survey to the Westons. It does not, however, make RMC's promises and obligations illusory and thus render the contract invalid. First, the provision leaves intact six of the eight promises (those embodied in paragraph 12(c) through (h)), made by RMC. The six remaining promises impose upon RMC a legal detriment; thus there remains adequate consideration to support the Westons' promises. Second, the phrase "except as herein provided," reasonably interpreted, does not extinguish the obligations expressed in 12(a) and (b), but only limits them. A party may expressly limit his obligations under a contract, yet not render his obligations illusory and the contract invalid. See Mandel v. Liebman, 303 N.Y. 88, 100 N.E.2d 149 (1951).
Especially where the economic interests of the parties are aligned (the more valuable the preliminary reports in enabling the Westons to acquire better lease terms, the greater RMC's share under the contract), it does not seem unreasonable for limits to be placed on the one party's obligations.
In similar fashion, paragraph 30 limits the expenditures required of RMC "except as specified in paragraph 12 above." Both provisions have the effect of limiting RMC's obligations to those embodied in paragraph 12(a) through (h). They do not, however, extinguish those promises and obligations. Hence, the promises are not illusory.

III. UNCONSCIONABILITY
RMC's second contention is that the contract was not unconscionable.
Although the right to contract freely on terms which establish and allocate risks between the contracting parties is fundamental, courts nonetheless recognize some limits to the extent to which a party may be compelled to perform an unconscionable duty. In Bekins Bar V Ranch v. Huth, Utah, 664 P.2d 455, 459 (1983), we stated:
With a few exceptions, it is still axiomatic in contract law that "[p]ersons dealing at arm's length are entitled to contract on their own terms without the intervention of the courts for the purpose of relieving one side or the other from the effects of a bad bargain." Biesinger v. Behunin, Utah, 584 P.2d 801, 803 (1978). Parties "should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side." Carlson v. Hamilton, 8 Utah 2d 272, 275, 332 P.2d 989, 991 (1958). Although courts will not be parties to enforcing flagrantly unjust agreements, it is not for the courts to assume the paternalistic role of declaring that one who has freely bound himself need not perform because the bargain is not favorable. Of course, this general principle has its limits. An established exception is that if a contract is unconscionable, in whole or in part, the court may, on equitable grounds, refuse to enforce the unconscionable provisions, or it may construe the contract to avoid an unconscionable result. E.g., Biesinger *1041 v. Behunin, supra, at 803; Russell v. Park City Utah Corp., Utah, 548 P.2d 889, 891 (1976); Carlson v. Hamilton, supra, 8 Utah 2d at 275, 332 P.2d at 991. See also 5 Corbin on Contracts §§ 1057, 1063, 1075 (1964); Note, 72 Yale L.J. 723 (1963).
Historically, a bargain was said to be unconscionable if it was "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other... ." Hume v. United States, 132 U.S. 406, 411, 10 S.Ct. 134, 136, 33 L.Ed. 393 (1889). A less stringent standard was enunciated by Chancellor Kent. The inequality "must be so strong and manifest as to shock the conscience and confound the judgment of any man of common sense." Osgood v. Franklin, 2 Johns. Ch. 1, 23, affirmed sub nom., Franklin v. Osgood, 14 Johns. 527 (cited in Mandel v. Liebman, 303 N.Y. 88, 100 N.E.2d 149, 152 (1951)). Similarly, the Court in Carlson v. Hamilton, 8 Utah 2d 272, 275, 332 P.2d 989, 991 (1958), described an unconscionable contract as one in which "no decent, fair-minded person would view the ensuing result without being possessed of a profound sense of injustice."
In recent years, the common law doctrine of unconscionability has been adopted by the Uniform Commercial Code. See U.C.A., 1953, § 70A-2-302. Although section 2-302 does not define unconscionability, the accompanying official comment provides:
The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract... . The principle is one of the prevention of oppression and unfair surprise (Cf. Campbell Soup Co. v. Wentz, 172 F.2d 80, (3d Cir.1948)) and not of disturbance of allocation of risks because of superior bargaining power.
(Emphasis added.) U.C.C. § 2-302, Comment 1. Many courts have applied the U.C.C. approach to cases not strictly governed by the U.C.C.
Whatever the particular formulation, the standard for determining unconscionability is high, even if not precise. This Court has held forfeiture provisions in land sale contracts unenforceable where the award was so disproportionate at the time of default as to shock the conscience, see Morris v. Sykes, Utah, 624 P.2d 681, 684 (1981); Jacobson v. Swan, 3 Utah 2d 59, 278 P.2d 294 (1954), and has recognized unconscionability as a defense in a suit for specific performance or damages. E.g., Bekins Bar V Ranch, supra, 664 P.2d 455; Biesinger v. Behunin, supra, 584 P.2d at 803; Russell v. Park City Utah Corp., Utah, 548 P.2d 889 (1976).
"Unconscionable" is a term that defies precise definition. Rather, a court must assess the circumstances of each particular case in light of the twofold purpose of the doctrine, prevention of oppression and of unfair surprise. J. Calamari & J. Perillo, Contracts § 9-40 (2d ed. 1977); U.C.C. § 2-302, Comment 1. Recognition of these purposes has led to an analysis of unconscionability in terms of "substantive" and "procedural" unconscionability. "Substantive unconscionability" examines the relative fairness of the obligations assumed. "Procedural unconscionability" focuses on the manner in which the contract was negotiated and the circumstances of the parties.
Substantive unconscionability is indicated by "contract terms so one-sided as to oppress or unfairly surprise an innocent party," Bekins Bar V Ranch, supra, 664 P.2d at 462; Bill Stremmel Motors, Inc. v. IDS Leasing Corp., 89 Nev. 414, 514 P.2d 654, 657 (1973); "an overall imbalance in the obligations and rights imposed by the bargain," Bekins Bar V Ranch, supra, 664 P.2d 462; excessive price, Bekins Bar V Ranch, supra, 664 P.2d at 462; American Home Improvement, Inc. v. MacIver, 105 N.H. 435, 201 A.2d 886 (1964) (decided under U.C.C.); or significant cost-price disparity, *1042 Wille v. Southwestern Bell Telephone Co., 219 Kan. 755, 549 P.2d 903, 907 (1976). If the U.C.C. is to be relied on as a guide, the terms are to be evaluated "in the light of the general commercial background and the commercial needs of the particular trade or case." U.C.C. § 2-302, Comment 1. Corbin counsels that the test is whether the terms are "so extreme as to appear unconscionable according to the mores and business practices of the time and place." 1 Corbin on Contracts § 128, at 551 (1963).
Procedural unconscionability was recharacterized in Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449 (D.C. Cir.1965), as "absence of meaningful choice." The court elaborated:
Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power. The manner in which the contract was entered is also relevant to this consideration. Did each party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices?
(Footnotes omitted.)
Indices of procedural unconscionability include "`[t]he use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position,'" generally offered on a take-it-or-leave-it basis, Bekins Bar V Ranch, supra, 664 P.2d at 462 (quoting Wille v. Southwestern Bell Telephone Co., supra, 549 P.2d at 903); phrasing contractual terms "in language that is incomprehensible to a layman or that divert[s] his attention from the problems raised by them or the rights given up through them," Bekins Bar V Ranch, supra, 664 P.2d at 462; hiding key contractual provisions in a maze of fine print, Williams v. Walker-Thomas Furniture Co., supra, 350 F.2d at 449, or in an inconspicuous part of the document, Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960); minimizing key contractual provisions by deceptive sales practices, Williams v. Walker-Thomas Furniture Co., supra, 350 F.2d at 449; "lack of opportunity for meaningful negotiation," Bekins Bar V Ranch, supra, 664 P.2d at 462; whether the aggrieved party was compelled to accept the terms, In re Frederick's Estate, Wyo., 599 P.2d 550, 556 (1979); and "`exploitation of the underprivileged, unsophisticated, uneducated and illiterate,'" Bekins Bar V Ranch, supra, 664 P.2d at 462 (quoting Wille v. Southwestern Bell Telephone Co., supra, 549 P.2d at 907).
The distinction between substantive and procedural unconscionability is critical to opposing counsels' arguments in this case. Both would agree that if a contract were deemed both substantively and procedurally unconscionable, the contract would be considered unconscionable. Beyond that, however, their arguments diverge. Thus, RMC argues that a finding of substantive unconscionability is a prerequisite to ruling that a contract itself, as a matter of law or equity, is unconscionable. RMC's position is that evidence of procedural unconscionability, absent a finding of gross imbalance in the obligations of the parties or excessively high price, etc., would not support a finding of unconscionability.
The Westons contend that although elements of both substantive and procedural unconscionability were present in the contract, a contract may be unconscionable on the substantive grounds of unreasonable disparity in the relative duties and obligations imposed, even in the absence of procedural irregularities. The Westons do not assert that procedural unconscionability, apart from some indication of substantive *1043 abuse, is sufficient to invalidate a contract.
RMC's argument, which asserts a linkage between procedural unconscionability and some clear degree of substantive unfairness, is consistent with the standard enunciated by various courts. The standard of unconscionability set forth in Williams v. Walker-Thomas Furniture Co., supra, 350 F.2d at 449, for instance, states: "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (Emphasis added, footnote omitted.) See also Restatement (Second) of Contracts § 208, Comment d (1981). Nevertheless, in the cases cited by both RMC and the Westons in which unconscionability was found to exist, the existence of substantive unconscionability was either the dominant or exclusive issue. Gross disparity in terms, absent evidence of procedural unconscionability, can support a finding of unconscionability. See, e.g., Campbell Soup Co. v. Wentz, 172 F.2d 80 (3d Cir.1948); Marks v. Gates, 154 F. 481 (9th Cir.1907). While it is conceivable that a contract might be unconscionable on the theory of unfair surprise without any substantive imbalance in the obligations of the parties to the contract, that would be rare.
In either case, however, a duly executed written contract should be overturned only by clear and convincing evidence. Otteson v. Malone, Utah, 584 P.2d 878 (1978). Where only procedural irregularities are involved, the judicial doctrines of fraud, misrepresentation, duress, and mistake may provide superior tools for analyzing the validity of contracts.
Generally, the critical juncture for determining whether a contract is unconscionable is the moment when it is entered into by both parties. Bekins Bar V Ranch, supra, 664 P.2d at 461; Gladding v. Langrall, Muir & Noppinger, 285 Md. 210, 401 A.2d 662, 664 (1979); In re Frederick's Estate, Wyo., 599 P.2d 550, 556 (1979); Barnes v. Helfenbein, Okla., 548 P.2d 1014, 1020 (1976); Jamestown Farmers Elevator, Inc. v. General Mills, 413 F. Supp. 764, 772 (D.N.D. 1976), aff'd in part and rev'd in part, 552 F.2d 1285 (8th Cir.1977). "Ordinarily the fairness of a contract should be determined in light of the circumstances as they existed at the time of the making, and the adequacy of consideration for property should also be determined as of the making of the contract rather than according to the increased value at the time of trial." Richardson v. Fields, 270 Or. 368, 527 P.2d 708, 710 (1974). Unconscionability cannot be demonstrated by hindsight. In re Frederick's Estate, supra, 599 P.2d at 556; Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866, 875 (9th Cir.1979); Jamestown Farmers Elevator, Inc. v. General Mills, supra, 413 F. Supp. at 772.
The policy underlying that rule is that virtually all contracts involve the assessment of risks. How fast, if at all, will land values rise over the next ten years? Are interest rates likely to increase, decrease, or remain constant? Is a particular venture likely to be a wild success or an abysmal failure? What is the probability of a debtor's not repaying his debt? What collateral is necessary as security to protect against the debtor's possible failure to repay? Assessment of such risks is intrinsic to the process of contracting and affects the terms on which contracts are entered into.
To judge the substantive fairness of contracts at a date subsequent to their making could nullify many contracts entailing a speculative element. Option to purchase agreements, for instance, might prove particularly difficult to enforce. Contingency fee contracts would be suspect if the party contracting for the fee achieved unexpectedly beneficial results. Home mortgages executed at low interest rates prevalent in the late 1950's might, in the light of hindsight, today be considered unconscionable in substantive terms.
When viewed in light of the circumstances as they existed on September *1044 21, 1974, when the instant contract was executed, we cannot say that the contract was so unfair or oppressive in its mutual obligations as to shock the conscience. The contract was essentially like other contracts dealing with that particular subject matter. The Westons, before contracting with RMC, recognized that they needed advice and assistance in dealing with oil companies and their land men. The Westons' own expert conceded at trial that the role of land men was to move fast and to secure oil and gas leases at the least cost to their company. In the two leases entered into by the Westons prior to their contract with RMC, there was little or no negotiation over terms. The land was leased for the offered rate of $1 an acre bonus and $1-per-year rental, the same commodity that would later fetch a bonus of $100 an acre. The Westons apparently were also unaware that certain of the terms in the contract, such as leasing their land in multithousand-acre tracts, rather than 640-acre segments, might potentially work to their disadvantage.
In that atmosphere, it is difficult to place a monetary value on expert advice. Advice as to when to contract, and under what terms and conditions, was of value to the Westons. It is evident that in late 1974, the Westons needed advice from someone knowledgeable in the field of oil and gas leasing. They secured access to such advice by terms of paragraph 12, clauses (d) and (e), and paragraph 13 of the contract.
Furthermore, RMC obligated itself, at the Westons' request, "to provide submittals and proposals to companies and operators which might be interested in mineral potential of the subject real properties." Paragraph 12(g). The Westons' own expert conceded that such submittals are a common practice in the oil and gas leasing business and sometimes helpful in getting property leased. The transcript reveals that submittals were made to approximately 200 companies at the initiative of RMC, with at least the implied acquiescence of the Westons. The submittals apparently generated some interest in the properties, but no tangible results.
It is in light of their need for advice and current information that the consideration given by the Westons must be viewed in determining unconscionability or oppressiveness. If RMC failed its responsibilities under the contract, RMC may be liable for breach of contract, but not subjected to a claim that the contract was unconscionable.
Nevertheless, the Westons earnestly contend that the current value of the 2% royalty deed to be conveyed to RMC, combined with the exorbitant amount requested as damages in the complaint  when compared to the services actually rendered by RMC  dictate a holding of unconscionability. Evidence by the Westons' expert witness pegged the value of the 2% royalty interest at between $200,000 and $300,000, its value at the time of the trial. No evidence was adduced by the Westons as to the value of the 2% royalty interest when the contract was made. It is obvious, however, that if a royalty interest was worth between $200,000 and $300,000 at the time of trial, when leases in the Westons' locale were commanding $100-per-acre bonuses, its value would have been considerably less when leases of substantially similar property were bringing $1 per acre. At the time the contract was signed, there was minimal exploration in the area. The Westons' expert testified that there was a "substantial risk" attached to spending money in hope of a return from oil leasing or production. It is also pertinent that at the time the contract was made, no oil and gas well had ever been drilled in Rich County. In fact, as of the time of trial, there had still been no oil or gas well drilled in Rich County.
In essence, the contract was a kind of contingent fee contract that would be paid only if oil, gas, or other minerals were found on the Westons' land. Thus, even if the 2% royalty interest had a substantial market value at the time of trial, there was no certainty that a successful oil or gas well would even be drilled on the Westons' property.
This case is similar to Gladding v. Langrall, Muir & Noppinger, 285 Md. 210, 401 *1045 A.2d 662 (1979). There, defendants came to plaintiff, an accounting firm, seeking assistance in reducing a large tax liability. According to the terms negotiated by the parties, the defendants agreed to pay plaintiff a retainer and a variable percentage of any tax savings accrued as a result of plaintiff's efforts. An extraordinary reduction in defendant's tax liability was effected. When the accounting firm attempted to collect its due, however, defendant alleged unconscionability, arguing that "the disparity between the work actually performed by the respondent accounting firm and the compensation contractually payable for those services [was] so great the agreement [was] unconscionable and therefore should not be enforced." Id. at 664 (footnotes omitted). In rejecting defendant's claim, the court observed:
Contingent fee service employment contracts, by their very nature, establish a willingness on the part of the employer to compensate the employee for achieving a favorable result rather than for the number of hours required to obtain that end. In other words, contingent fee arrangements involve a gamble by both parties to the bargain, with the degree of success or failure of the undertaking determining the amount due.
Id. at 665. See also Mandel v. Liebman, 303 N.Y. 88, 100 N.E.2d 149 (1951) (defendant's agreement to pay plaintiff 10% of defendant's earnings due to opportunities procured by plaintiff in return for plaintiff's agreement to manage defendant's entertainment career not unconscionable, even though contract contained provision leaving "time and attention" to be spent to plaintiff's judgment).
In return for the service RMC was to perform, the Westons agreed to pay RMC a percentage of monetary proceeds from the leasing of their property and to convey to RMC a royalty interest of undetermined value. The more favorable the terms received in subsequent leases, the more both RMC and the Westons would benefit.
Finally, we note that numerous courts have considered the presence and advice of counsel to constitute circumstantial, if not conclusive, evidence that a contract is not unconscionable. See, e.g., Bernina Distributors, Inc. v. Bernina Sewing Machine Co., 646 F.2d 434, 440 (10th Cir.1981), opinion clarified by 689 F.2d 903 (10th Cir.1981). In re Frederick's Estate, supra, 559 P.2d at 556-57; Gladding v. Langrall, Muir & Noppinger, supra, 401 A.2d at 665; Bradley v. Heyward, 164 F. 107 (4th Cir.1908), aff'd, 179 F. 325 (4th Cir.1910); K & C, Inc. v. Westinghouse Electric Corp., 437 Pa. 303, 263 A.2d 390 (1970).
When the Westons negotiated and entered into the contract in September, 1974, they were without the assistance of counsel. However, they did seek advice of counsel in late April or early May, 1975. Following an exchange of letters between the Westons' attorney and RMC concerning the validity of the contract, the Westons  with advice of counsel  requested RMC's advice and assistance in evaluating two lease proposals that had been submitted to them. Nothing was said, however, about the contract's being unconscionable. The advice was rendered and RMC was thanked for the advice and instructed to prepare a lease for submittal in accordance with the advice. Up to that point, at least, it would appear that the Westons deemed the advice to have value to them. Shortly thereafter, relations between the parties broke down. But it is of some import that eight months after the Westons executed the contract, they, with the advice of their attorney, demanded performance of the terms of the contract by RMC. There was no indication by the Westons or their attorney that the contract, even at that time, was considered unconscionable.
Although unconscionability is usually determined at the time the contract is made, a court "is not powerless in equity to remedy that which it perceives as present unconscionability," Estate of Link v. Wirtz, 7 Kan. App.2d 186, 638 P.2d 985, 988 (1982), and may refuse to enforce a contract that, while equitable when made, has become unconscionable with passage of *1046 time. Id. The exception is limited, however, to instances "where the subsequent events relied upon were such as not to be within the reasonable contemplation of the parties at the time of the execution of the contract." 71 Am.Jur.2d Specific Performance § 82, at 111 (1973); see also Bergstedt v. Bender, Tex. App., 222 S.W. 547 (1920); Pike Rapids Power Co. v. Schwintek, 176 Minn. 324, 223 N.W. 612 (1929) (significant increase in land values between 1910 and 1925 not unforeseen). "The rule against specific performance has been said to apply only where the consequences of enforcement cannot be deemed to have been contemplated by the parties when the contract was made." Estate of Link v. Wirtz, supra, 638 P.2d at 989 (quoting from 81 C.J.S., Specific Performance § 20, at 737-40 (1977).
Thus, the relevant inquiry in the instant case is whether the conditions giving rise to the alleged disparity in contractual obligations between the parties could have been foreseen during the time the contract was in force. The contract in the instant case was based on a risk that RMC would receive nothing if it performed under the contract but that it might be rather handsomely rewarded if oil and gas were found. Clearly, it was in both parties' interests to secure oil and gas leases at terms most favorable to the Westons. The Westons' argument, extended to its logical end, would lead to the conclusion that the more successful RMC was in securing favorable terms on oil and gas leases for the Westons, the more unconscionable the contract would become. Yet it was the very purpose of the Westons in contracting with RMC to obtain the most favorable oil and gas leases possible. Realization of favorable terms, even though beyond the Westons' expectations, was not beyond the contemplation of parties at the time of making the contract. The mere fact that specific performance of the contract would deprive the Westons of large profits they might otherwise have made is not a bar to enforcement if the contract was otherwise fair. Great Lakes & St. Lawrence Transportation Co. v. Scranton Coal Co., 239 F. 603, 609-10 (7th Cir.1917).
Furthermore, the contract must be judged in light of the nature of the subject matter. The value of a royalty interest or a mineral interest in unproven land is inherently speculative. Haas v. Cerami, 201 La. 612, 10 So.2d 61, 63 (1942). A spectacular increase, or an equally spectacular decrease, in the value of one party's rights is not necessarily outside the reasonable contemplation of the parties. "Where the property involved is of a speculative character so that fluctuations in value could have reasonably been expected, the rule that an increase will not justify the denial of specific performance is especially applicable." Annot., "Change of conditions after execution of contract or option for sale of real property as affecting right to specific performance," 11 A.L.R.2d 390, 411 (1950). Thus, as with other contracts, the adequacy or fairness of consideration of a contract for a royalty or mineral interest is evaluated as of the time the contract was made. Gosnell v. Lloyd, 215 Cal. 244, 10 P.2d 45, 49 (1932); Haas v. Cerami, supra, 10 So.2d at 63; Axelrod v. Osage Oil & Refining Co., 29 F.2d 712, 729 (8th Cir.1928); Bradley v. Heyward, supra, 164 F. 107; 3A Summers, The Law of Oil & Gas § 598, at 206-07 (1958).
The Westons do not discuss unconscionability as of the time of consummating the contract. They do, however, refer to Marks v. Gates, 154 F. 481 (9th Cir.1907), in which the defendant Gates, for consideration of $1,000 cash and the cancellation of an approximately $11,000 debt, conveyed to Marks a one-fifth interest in all property that Gates might thereafter acquire, by whatever means, in Alaska. Marks eventually sought specific performance of the agreement, alleging that the property acquired by Gates in Alaska was worth more than $750,000. The Court denied specific performance stating:
[I]t may be said in general that mere inadequacy of consideration is not of itself ground for withholding specific performance unless it is so gross as to render *1047 the contract unconscionable. But where the consideration is so grossly inadequate as it is in the present case, and the contract is made without any knowledge at the time of its making on the part of either of the parties thereto of the nature of the property to be affected thereby, or of its value, no equitable principle is violated if specific performance is denied, and the parties are left to their legal remedies, if any they have.
Id. at 483. (Emphasis added.)
Marks, however, seems to be an instance more in line with the exception to the rule that the fairness of a bargain is to be evaluated when initially made. Neither Marks nor Gates, at the time the contract was made, knew the property involved or its present or potential value. Gates' acquisition of property worth $750,000 in 1907 surely was not within the reasonable contemplation of the parties. See also Prince v. Lamb, 128 Cal. 120, 60 P. 689 (1900).
In sum, we conclude that it was error for the court to hold that the contract was one that shocked the conscience when it was made. Nor do the events subsequent to the making of the contract warrant a different conclusion.

IV. PROCEDURAL UNCONSCIONABILITY
Several of the trial court's findings of fact focus on the failure of Stevenson to adequately explain the meaning of certain terms in the contract:
Stevenson was a highly educated man who had been involved in oil and gas exploration and acquisitions since 1957, whereas none of the Weston brothers had had any substantial experience in oil and gas leasing, consulting, or evaluation, as Stevenson knew, and under the circumstances, Stevenson had a duty to explain the ramifications of the contract to the Westons... .
(Emphasis added.)
RMC challenges this finding, arguing that the italicized language constitutes a conclusion of law, not an issue of fact, and is, therefore, fully reviewable by this Court. We agree: Finding No. 26 is inaccurate. One party to a contract does not have a duty to ensure that the other has a complete and accurate understanding of all terms embodied in a written contract. See Garff Realty Co. v. Better Buildings, Inc., 120 Utah 344, 349, 234 P.2d 842, 844 (1951). Each party has the burden to understand the terms of a contract before he affixes his signature to it and may not thereafter assert his ignorance as a defense. In Garff we stated:
"Ignorance of the contents of an instrument does not ordinarily affect the liability of one who signs it. * * * If a man acts negligently and in such a way as to justify others in supposing that the writing is assented to by him, he will be bound both at law and in equity, even though he supposes the writing is an instrument of an entirely different character... . [A] person who, having the capacity and an opportunity to read a contract, is not misled as to its contents and who sustains no confidential relationship to the other party cannot avoid the contract on the ground of mistake if he signs it without reading it, at least in the absence of special circumstances excusing his failure to read it. If the contract is plain and unequivocal in its terms, he is ordinarily bound thereby."
Id. at 844, quoting 12 Am.Jur. Contracts § 137, at 628-29 (1938).
The trial court did not find that Stevenson misrepresented the obligations of the respective parties under the contract except for the possibly ambiguous effect on paragraph 9 of the amendment to paragraph 3.[7] For all that appears, all parties were unaware of the potential ambiguity. *1048 The meaning of the amendment was as much for the Westons to clarify as it was for RMC. Nevertheless, the meaning of paragraphs 3 and 9 and the issue of whether any ambiguity should be construed against the author of the language will remain for the trial court to determine on the remand of this case.
The evidence indicates that Stevenson read through either all or most of the terms of the contract, and when asked, he explained a particular provision in more detail. If the Westons felt uninformed about the provisions of the contract, were unsatisfied with Stevenson's explanations, or desirous of legal advice, it was incumbent upon them to read the contract and to seek the advice of an attorney before signing the contract.
Although it is apparent that Stevenson's expertise in dealing with oil and gas leases exceeded the Westons' (indeed that was the primary reason why the Westons employed RMC), the bargain struck was not unconscionable because of the Westons' ignorance or inability to read. See, e.g., Jones v. Star Credit Corp., 59 Misc.2d 189, 298 N.Y.S.2d 264 (1969) (poor, uneducated welfare recipient); Frostifresh Corp. v. Reynoso, 52 Misc.2d 26, 274 N.Y.S.2d 757 (1966), rev'd as to damages, 54 Misc.2d 119, 281 N.Y.S.2d 964 (1967) (defendant literate only in Spanish); Leathers v. Deloach, 140 Tenn. 259, 204 S.W. 633 (1918) (vendor mentally incapacitated). The Westons had all attended high school; one of them attended college. Collectively, they owned and managed the operations on over 8,000 acres of ranchland. They had leased land from the Bureau of Land Management, and they were astute enough to have organized their operations into a corporation and were in the process of subdividing that corporation into smaller corporations. In short, the Westons were fully competent to make a bargain and to understand both the terms of the bargain and their implications.
Nor is this a situation in which one party to the contract is confronted by an absence of meaningful choice. The very fact that the Westons insisted that RMC amend paragraph 3 of the contract to coincide with their wishes evidences to the contrary. Nor were the Westons in a position where they were compelled to accept the bargain offered by RMC and Stevenson. In fact, it was the Westons who held the trump card. The choice to assent to the deal, to negotiate modifications of its terms, or simply walk away was theirs.
One additional finding, pertaining to the Westons' understanding of the contractual terms that should be addressed, is the trial court's finding that Stevenson refused after the September 20 meeting to give a copy of the contract to George Weston for examination and that as a consequence none of the Westons had a full understanding of the contract's terms. We respect the trial court's finding unless it is clearly erroneous. In this instance, the evidence presented at trial simply does not support the finding. First, George Weston's testimony indicated that he asked Stevenson for a copy of the contract after the preliminary September 19 meeting, not the September 20 meeting. Stevenson replied that he had only one copy with him at that time. There is no evidence in the record indicating that George Weston asked for a copy of the contract following the principal September 20 meeting, much less any evidence indicating that Stevenson refused such a request.
The trial court also found that the contract was on a form developed by RMC and that the provisions were set out in small type on two legal-size sheets of paper. That the terms of a contract are embodied in a written form developed by one of the parties does not automatically render it either a contract of adhesion or unenforceable. In re Frederick's Estate, supra, 599 P.2d at 557; 3 Corbin on Contracts § 559, at 270 n. 18 (1960). Nor is the existence of small print a conclusive determinant of a contract's unconscionability. Far more important is whether key terms are "hidden in a maze of fine print and minimized by deceptive sales practices." Williams v. Walker-Thomas Furniture Co., supra, *1049 350 F.2d at 449 (emphasis added); see also, Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69 (1960). Usually this practice is more likely to occur in contract of adhesion or consumer contracts. In this instance, the salient provisions of the contract were displayed with equal prominence in relation to other provisions in the contract. The primary obligations of the parties are found in paragraphs 5 and 12, which are the longest provisions in the contract and both are found on the first page. The provisions are reasonably straightforward, and the terms used are generally comprehensible to a layman. Finally, the entire contract is only two pages long. This case is a far cry from those cases where fine print, complex terminology, and presentation of contract form on a take-it-or-leave-it basis constitute the basis for a finding of unconscionability. See, e.g., Seabrook v. Commuter Housing Co., 72 Misc.2d 6, 338 N.Y.S.2d 67 (1972), aff'd on other grounds, 79 Misc.2d 168, 363 N.Y.S.2d 566 (1973).
A couple of other findings also warrant examination. First, the trial court found that the property leased to Ram Petroleum prior to September 21, 1974, was included in the contract against the Westons' instructions. That does not, however, buttress the conclusion that the contract was unconscionable in this case. Because extrinsic evidence indicated that it was the parties' intention not to make that property subject to the contract, the trial court, before trial, ruled that the properties leased to Ram Petroleum prior to September 21, 1974, were not part of the contract.
Second, the trial court found that the royalty deed form customarily used by RMC contained terms that granted rights in excess of those provided in paragraph 5 of the contract.[8] The differences were relatively minor. A form of royalty deed customarily used by RMC was produced at trial. If executed, that deed would have granted RMC rights in excess of the contract, but that does not bear upon the conscionability of the underlying contract. In fact, RMC never requested that the Westons execute a royalty deed on terms in accordance with its form. In any event, the Westons were not legally obligated to convey to RMC any rights in excess of those embodied in the contract.

V. ON REMAND
Although the trial court's rulings with respect to adequacy of consideration and unconscionability are erroneous as a matter of law, it does not follow that RMC is entitled to specific performance. The trial court declined to decide major issues presented and argued by the parties. Both parties alleged that the other had breached the contract. If RMC materially breached the contract, specific performance should not be granted. 11 S. Williston, The Law of Contracts § 1425, at 829 (3d ed. 1968).
If, however, RMC is entitled to specific performance, further inquiry must also be made into which of the twelve oil and gas leases executed by the Westons between September 21, 1974, and August 16, 1981, the date of trial, are subject to the contract. Paragraph 3 of the contract, as amended, provides that the term of the contract is five years, commencing September 21, 1974. The Westons testified that their intent in negotiating a change in the contract was to have the contract run for only five years, and at the end of that time, they, and not RMC, were to have the option of extending it. Paragraph 9, however, provides: "The term of this Agreement and any extensions thereof shall be automatically extended to coincide with the longest term of any agreement entered into between the OWNERS and any third parties regarding any minerals or mineral rights covered by the terms of this Agreement." There may be a conflict between the two provisions. Paragraph 9, read by itself, seems capable of at least two interpretations. First, the provision may be interpreted as extending to all leases made to oil companies during the primary term of the contract and all extensions of previously made leases.
*1050 Paragraph 9 could also be construed to mean that RMC is entitled to a percentage of revenues on all leases negotiated during the five-year term, even though the terms of the leases might run for five, ten, or more years. However, paragraph 3, if read alone, seems to suggest that the contract applied only to initial contracts made during the five-year period of the contract and that the landowners would have no obligations beyond that term. Which of these or other interpretations should be placed on Paragraphs 3 and 9 must be resolved by the trial court. The consequence of one interpretation rather than the other, for instance, would be the difference between including, or not including, in the contract bonus and rental payments generated by the leases executed October 24, 1979 (J.W. Ranching Co. to Mesa Petroleum), and March 17, 1981 (Morrell Weston & Sons to KEE Exploration).
The judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion. Costs to appellant.
HOWE, DURHAM and ZIMMERMAN, JJ., concur.
HALL, C.J., concurs in the result.
NOTES
[1] Although a single corporation, it was the practice of the Westons to each manage that portion of the ranch he considered his own and to make all business decisions relating to his portion of the ranch. Either shortly before or shortly after they entered into the contract with RMC, which is the subject of this lawsuit, the Westons set plans in motion to divide the corporation into four new corporations, with each to be headed by one of the four. The parties have stipulated that the actions of the now-defunct Weston Ranch may be ascribed to its successor corporations.
[2] William Stevenson testified that at the time the contract with the Westons was entered into, he had entered into approximately 170 such contracts.
[3] There is testimony in the record to the effect that the Westons regarded the revision of paragraph 3 as giving them, rather than RMC, the option of extending the contract another five years. That view is not supported by the wording of the provision.
[4] A royalty interest is distinguishable from a mineral interest. Ownership of a full mineral interest implies (a) the power to lease, (b) the right to receive bonuses, (c) the right to receive delay rentals, and (d) the right to receive royalties. 1 Kuntz, Law of Oil & Gas § 15.1 (1962). An owner of a royalty interest, absent specific provision to the contrary, does not acquire the power to lease; does not have rights of ingress or egress for purposes of extracting minerals; and is not entitled to receive bonuses or delay rentals payable under an oil or gas lease. The owner of a royalty interest receives a perpetual interest (though a term of years may be granted), entitling him to the "described fraction of oil and gas produced and saved, free of costs." Id. at § 15.4. This interest is commonly referred to as a non-participating royalty interest. Thus, a party having conveyed a 2% royalty interest to another, assuming it reserved to itself the 12½% royalty traditionally reserved under an oil and gas lease, would be left with a 10½% royalty interest.
[5] George Weston testified that he signed the leases as the secretary of the corporation without comprehending what they were.
[6] Williston's statement was paraphrased in the Westons' brief to this Court, but was quoted verbatim in their Post-Trial Memorandum of Points and Authorities.
[7] In its memorandum decision, the trial judge stated that Stevenson's failure to point out the apparent contradiction between paragraph 3, as revised, and paragraph 9 was "clearly equivalent to a misrepresentation by plaintiff."
[8] The royalty deed in question would have granted rights of ingress and egress to the grantee.